**[J-55-2019]**

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 769 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | 10/3/18 in the Court of Common Pleas, |
| | : | Lancaster County, Criminal Division at |
| | : | CP-36-CR-0002879-2010 |
| v. | : | |
| | : | |
| JAKEEM LYDELL TOWLES, | : | |
| | : | |
| Appellant | : | SUBMITTED: March 26, 2019 |

*OPINION*

**CHIEF JUSTICE SAYLOR**                              **DECIDED: MAY 31, 2019**

This is an appeal from an order denying relief on a capital post-conviction petition.

## I. Background

On May 7, 2010, Appellant shot and killed the victim, Cornell Anton Stewart, Jr., outside a former fire hall in Columbia, Pennsylvania, which had been converted into a local "fun center." The center was hosting rap music performances, including a set of songs performed by the victim and another individual, John Wright.

At a jury trial, Appellant was found guilty of first-degree murder, and the jurors returned a death sentence at the conclusion of the penalty phase of the trial. The judgment of sentence was sustained by this Court on direct appeal. *See Commonwealth v. Towles*, 630 Pa. 183, 106 A.3d 591 (2014).

Appellant filed the instant post-conviction petition averring, *inter alia*, that his trial counsel was ineffective for rendering allegedly unreasonable advice encouraging Appellant to refrain from testifying at the guilt phase of his trial, and for failing to call a forensic psychologist, Gerald Cooke, PhD, as a defense witness at the guilt phase to opine that Appellant's intoxication and paranoid personality features played a substantial part in his actions.[1]

Circumstances from Appellant's trial relevant to these claims are as follows.[2] The Commonwealth presented evidence that, prior to their arrival at the center, Appellant, his cousin, Tyrone Hunter, and a friend, Antwain Robinson, ingested substantial quantities of alcohol and smoked marijuana. *See, e.g.*, N.T., May 8, 2012, at 265, 310-11; N.T., May 9, 2012, at 431. The prosecution also established that Appellant had surreptitiously removed a handgun from Hunter's apartment and secreted it in an alleyway situated behind the center. *See* N.T., May 8, 2012, at 288-289, 295.

In his opening remarks, the prosecutor summarized the Commonwealth's case for first-degree murder as follows:

> The show was set to begin at 10[pm]. They -- John Wright
> went by the name of J Dub when he was performing and
> Anton Stewart went by the name of Young EZ.
>
> *       *       *

---

[1] The standards governing claims of deficient attorney stewardship in criminal cases are set forth in myriad decisions. To succeed on an ineffectiveness claim, a petitioner must establish that: the underlying legal claim has arguable merit; counsel had no reasonable basis for her action or inaction; and the petitioner suffered prejudice as a result. *See Commonwealth v. Pierce,* 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987).

[2] For better clarity, the discrete background for the remaining claims that Appellant has advanced in this appeal is developed in Part II of this opinion, contemporaneous with the disposition of each of those matters.

> . . . There were a couple of opening acts. And they went on to perform.
>
> However, they did not even get to complete their first song, because as you will hear, there was a man in the crowd that night, a man who was just looking for trouble.
>
> That man approached John Wright as he was performing. He grabbed the mic from John Wright. Subsequent to that, the man made a threating gesture to another performer. From that a scuffle ensued, right there during the performance.
>
> As a result of that scuffle, that man who was looking for trouble that night was escorted out the front door. John Wright was taken out to the back of the establishment.
>
> And, ladies and gentlemen, just minutes later, that man returned to the back of that establishment and opened fire.

N.T., May 7, 2012, at 23-24. The Commonwealth then presented supportive eyewitness testimony. *See, e.g.*, N.T., May 8, 2012, at 103-141 (direct testimony of Wright); *id.* at 206-255 (Hunter); *id.* at 278-307 (Robinson). Through various witnesses, the Commonwealth also demonstrated that Appellant fled the scene and intended to permanently leave the local area, made incriminating statements to various witnesses and instructed others not to talk, and was untruthful with police when he ultimately surrendered himself. *See, e.g.*, N.T., May 8, 2012, at 300; N.T., May 9, 2012, at 356, 373-375.

The Commonwealth pursued the first-degree murder conviction under the theory that Appellant intended to kill Wright -- because Wright had assaulted him during the altercation inside the center -- but had inadvertently shot the victim. *See, e.g.*, N.T., May 10, 2012, at 548. *See generally* 18 Pa.C.S. §303(b)(1) (embodying the criminal-law doctrine of transferred intent). The defense, for its part, conceded that Appellant was the shooter but sought a lesser verdict of voluntary manslaughter on the theory that

the Commonwealth could not establish the essential element of malice, since Appellant purportedly acted in the heat of passion. *See* 18 Pa.C.S. §2503(a) (delineating the elements of the crime of heat-of-passion voluntary manslaughter, including the killing of an individual without lawful justification while "acting under a sudden and intense passion resulting from serious provocation").

In an effort to advance the heat-of-passion voluntary manslaughter theory, Appellant presented expert testimony from a medical toxicologist, Lawrence Guzzardi, M.D., to demonstrate that Appellant was highly intoxicated and that his perceptions and judgment were also affected by the assault he had sustained. *See* N.T., May 10, 2012, at 464-482. Responding to an objection by the Commonwealth, however, the trial court precluded the expert from rendering an opinion specific to the case. The court explained that, given that Appellant was exercising his right against self-incrimination and refraining from testifying, he could not supply the predicate facts. *See id.* at 444-445. In response, the defense couched the toxicologist's testimony in terms of a hypothetical scenario intended to mirror Appellant's circumstances as depicted in the trial evidence. *See id.* at 464-482.

In the post-conviction proceedings, the PCRA court conducted an evidentiary hearing pertaining to select claims. Appellant offered testimony from both attorneys who represented him at trial, initially in furtherance of the contention that they rendered deficient stewardship in advising Appellant not to testify. Both lawyers attested that their primary concern was to prevent the Commonwealth from confronting Appellant with the fact that he had a prior conviction for robbery. *See, e.g.*, N.T., Sept. 18, 2017, at 49, 110. According to the lead attorney:

> [Appellant] has a robbery conviction as an adult and I thought it would be better . . . for the jury to [know only] that [he] would have just been somebody there who just

> happened to be there [at the center] and did not have that
> type of conviction.
>
> I thought it would be much tougher to make an argument for
> voluntary manslaughter if they knew that he had a conviction
> for robbery.

*Id.* at 110. Lead counsel also expressed a lesser reservation regarding whether Appellant would present consistent, credible testimony. *See id.* at 132-134.

In terms of the evidence of Appellant's intoxication, the following interchange occurred with lead counsel:

> Q. So am I correct that you knew when you advised [Appellant]
> not to testify that there would be no way for the jury to know
> from [Appellant's] perspective how impaired he was from the
> drugs and the alcohol?
>
> A. Well, the impair [sic] for drugs and alcohol would have been
> an argument for diminished capacity, which would have
> been third degree [murder]. We were not arguing for third
> degree.
>
> We were arguing heat of passion. Now, Guzzardi had an
> element for that in terms of the drugs and the alcohol being
> in -- almost like a multiplier effect in the way he felt. And
> that's how we were able to introduce that evidence[.].

*Id.* at 111-112.[3]

Appellant also presented post-conviction testimony from the forensic psychologist, Dr. Cooke. Prior to trial, the expert had been engaged by the defense to conduct psychological and neuropsychological examinations upon Appellant in preparation for the penalty phase of trial, albeit the defense had chosen to call the lead

---

[3] Counsel is correct that Pennsylvania law sharply limits the use of evidence of voluntary intoxication in criminal cases. *See infra* Part II(A)(2) (discussing 18 Pa.C.S. §308). As explained below, however, his suggestion that such evidence may be integrated into a defense effort to secure a lesser verdict of heat-of-passion voluntary manslaughter is materially problematic. *See id.*

mental-health expert, psychiatrist Jerome Gottlieb, M.D. -- and not Dr. Cooke -- at that stage. Dr. Cooke testified that he had diagnosed Appellant with chronic persistent depression, drug dependency, alcohol abuse, and personality disorder with antisocial and paranoid features. *See* N.T., Sept. 18, 2017, at 11. The forensic psychologist also indicated that Appellant manifested substantial difficulties with perceptual reasoning and processing speed, *i.e.* "how quickly a person can correctly view a situation," which were magnified by drug and alcohol use. *See id.* at 9-10; *see also id.* at 15-16 (reflecting Dr. Cooke's testimony that Appellant's paranoia would have been exacerbated by his intoxication, and his impulse control would have been diminished). According to Dr. Cooke, "a person like [Appellant] will perceive even common criticisms as an attack, and feel like they have to respond to an attack." *Id.* at 12; *see also id.* at 15 (reflecting Dr. Cooke's testimony that, if provoked, Appellant "will respond aggressively").

On cross-examination, Dr. Cooke acknowledged that he had determined that, at the time of the murder, Appellant was capable of forming a specific intent to kill. *See id.* at 22. Furthermore, lead trial counsel testified that the experts consulted by the defense -- including Dr. Cooke -- indicated in pretrial discussions that, given the circumstances of the killing as they understood them, they were unable to support the various theories the defense was considering. *See* N.T., Sept. 18, 2017, at 101-107, 144-149.

Specifically, trial counsel testified that Dr. Cooke "did not disagree" with Dr. Gottlieb, in that he:

> wouldn't support self-defense, because [Appellant] could have walked away.
>
> He wouldn't support heat of passion because of the same reason.
>
> And he wouldn't support third degree, diminished capacity, voluntary intoxication because he felt the level of details that

[Appellant] expressed to him was not consistent with someone that was under the influence of alcohol or drugs that are required for third degree.

*Id.* at 103-104; *see also id.* at 148-19.

Finally, Appellant was offered as the final witness at the post-conviction hearing. He stated that he had wished to testify at trial in his own defense, but that trial counsel said that he did not need to do so, because Dr. Guzzardi would cover the same ground. *See id.* at 184. Appellant also related his version of the events surrounding the homicide, encapsulated in the following narrative taken from his present brief:

> [Appellant] just wanted to leave the club to get away from those individuals who had just "jumped" him. He had absolutely no intention of returning to the Family Fun Center that night.
>
> Critically, [Appellant] could have also explained to the jury that he went to the alley [behind the center] and retrieved the gun with the intention of leaving and *nothing* else. . . .
>
> He was on his way *out of the area* when he heard someone yell "Yo." He turned around and saw his cousin standing on 4th Street. He and Hunter started to walk toward each other. [Appellant] had no intention of shooting *anyone*. . .. If believed, the jury could have found that [Appellant] only intended to go back to get Hunter and leave. If he had intended to go back and seek revenge he would have had the gun drawn. Instead, it is uncontested that the gun remained tucked in his waistband as he walked toward [his cousin].
>
> [Appellant] was a couple of feet away from [his cousin] when he heard "Yo, there he go right there." [Appellant] didn't see who was yelling. However, when he turned to his right he saw one of the people who had been inside the club earlier pointing *at him* and others still coming out the back door.
>
> [Appellant] had a history of getting "jumped" and as a result, was very fearful and paranoid of it happening again. Critically, *only* [Appellant] could have told the jury how he

was feeling and what he was thinking at that precise moment.

\* \* \*

Reacting out of fear, and believing that they were going to give chase if he just ran, [Appellant] pulled the gun from his waist and fired in their direction. He didn't even raise the gun all the way up. He was not firing *at* anyone -- just in their general direction. He wanted them to "back off" so that he could get away.

Brief for Appellant at 14-16 (emphasis in original; citations omitted).

The PCRA court issued an opinion and order denying relief. *See Commonwealth v. Towles*, No. 2879-2010, *slip op.* (C.P. Lancaster Oct. 3, 2018). With respect to Appellant's claim of deficient stewardship in the advice for him to refrain from testifying, the PCRA court reasoned that such testimony would have been "highly prejudicial" to the defense's assertion that the killing occurred in the heat-of-passion. *Id.* at 5. The court explained:

[Appellant] did not testify that he was acting under a sudden and intense passion resulting from serious provocation that rendered him incapable of reason. In fact, [he] testified that each action he took after being escorted out of the club was a choice resulting from reason. His testimony, if credible, reflects a clear recollection of the events of the evening in detail as well as a clear purpose for each action taken by [him].

He testified that he walked, but didn't run, away from the club with Mr. Robinson because he wanted to get away from the club, that he was able to recall that he had stashed the gun in the alleyway earlier in the evening and, despite being afraid and only wanting to get out of the area, stopped to retrieve the gun and put it in his waistband. [Appellant] also testified that his reason for stopping to retrieve the gun was because he felt protected having it "in case somebody came out again."

[Appellant] testified that when he subsequently heard someone behind yell "yo," that he did not pull the gun, but turned around and recognized his cousin coming up the alley towards him. Again, despite claiming to be in fear and only wanting to get away from the club, [Appellant] testified that he began walking back towards the club, but only for the purpose of meeting up with his cousin. [Appellant] testified that when he heard someone yell "there he go right there" he turned and saw people at the back of the club pointing at him and felt threatened.

[Appellant] testified that he did not recognize anyone in the group behind the club, but because he felt threatened and like they were going to come after him, he pulled the gun from his waistband, pointed it toward the group and fired it multiple times in their direction. [Appellant] testified that he did not fire the gun toward the group because he wanted to kill anyone, but thought that firing the gun at them would scare the group and keep them from coming after him.

[Appellant's] testimony reveals that he was acting with clear purpose and reason when he fired multiple shots at the group of people behind the club. That testimony, even if believed, does not demonstrate a killing resulting from an objective serious provocation or a killing by a person incapable of reason with no time for cool reflection. It demonstrates murder with malice.

*Id.* at 5-6 (citations omitted; paragraphing added).

Along these lines, the PCRA court observed that Appellant's testimony more closely approximated a defense that he had unreasonably believed that he was justified in using deadly force. *See* 18 Pa.C.S. §2503(b) (setting forth the crime of unreasonable-belief voluntary manslaughter or imperfect self-defense). The court also noted, however, that this defense lacked merit, "because the circumstances, even as [Appellant] believed them to exist, would not have legally justified the use of deadly force." *Towles*, No. 2879-2010, *slip op.* at 6 n.12 (noting that Appellant "admitted that he was not initially attacked with any weapons, that he observed the group at the time of

the killing not to have any weapons, that he was in an elevated position from the group and that he could have retreated to a place of safety, if necessary or so desired").[4]

The PCRA court further explained that most of what was developed in Appellant's post-conviction testimony already was on the record from other sources:

> Mr. Hunter testified that [Appellant] and Mr. Robinson were walking away from the club and did not turn around until Mr. Hunter yelled to them. He also testified that he heard someone from the back of the club yell "there they go right there" and then saw [Appellant] raise the gun and fire three shots.
>
> Relevant to [Appellant's] claim concerning the extent of the preceding assault by Mr. Wright, there was no evidence in the record that [Appellant] was the aggressor of physical violence and, in fact, several witnesses testified to the contrary and acknowledged that [Appellant] was walking away when Mr. Wright assaulted him. Additionally, several witnesses, including . . . Mr. Wright, noted that [Appellant] took multiple hard hits and that the hits were enough to knock him down at least partially to the floor. While [Appellant] currently claims that his testimony would have described a more severe attack by multiple unknown persons, his statements to police immediately following the incident, which were admitted at trial, corroborate the testimony of the witnesses at trial. This version of events was also corroborated by the fact that [Appellant's] only visible injury following the assault was a scab on his lip that was there prior to the attack.

*Id.* at 6-7 (citations omitted).

Regarding Appellant's intoxication "to the extent that it was relevant," the PCRA court found that ample evidence had been adduced at trial that Appellant had "imbibed

---

[4] This Court has also indicated that a defendant advancing a self-defense or an imperfect self-defense claim must admit that he acted with the intent to use deadly force upon another individual to protect himself. *See Commonwealth v. Philistin*, 617 Pa. 358, 378, 53 A.3d 1, 12 (2012).

heavily in alcohol and marijuana throughout the evening and was visibly intoxicated." *Id.* at 8. The court also opined that Appellant's testimony concerning his own intoxication would have added little to Dr. Guzzardi's testimony. *See id.*

Turning to the testimony of Appellant's lead attorney at trial, the PCRA court stressed that, although counsel ultimately advised Appellant not to testify, he had informed Appellant of his right to do so, discussed potential downsides, and left the decision up to Appellant. *See id.* at 9 (citing N.T., Sept. 18, 2017, at 77, 87, 109-111, 126-130). Additionally, the court reasoned:

> [Appellant] was advised not to testify because doing so would permit evidence of [his] prior robbery conviction and because [Appellant's] lack of credibility would have hurt his defense. [Appellant's] counsel for the penalty phase of trial . . . testified that she discussed the possibility of [Appellant] testifying with her co-counsel, but thought it would be strategically unwise for him to do so because his robbery conviction, which is considered a crime of violence, would have hurt him in the penalty phase of trial. [Penalty counsel] explained that having the jury know about [Appellant's] prior robbery conviction would have made it harder to convince the jury that [Appellant] had value and did not deserve the death penalty.
>
> [Lead counsel] explained that he had a strategic basis for advising [Appellant] not to testify, in that he wanted the jury to see [Appellant] as someone without a history of crime and violent encounters, especially given the evidence that [Appellant] had previously asked for the gun. Having [Appellant] testify to or opening the door to testimony concerning a history of altercations, paired with the testimony that [Appellant] had made prior requests for the gun, could have implied [Appellant] was seeking trouble, it would have shown that [Appellant] had prior experience with violent encounters and it would have made it harder for a jury to believe [Appellant] was merely acting in the sudden heat of the moment.

> Despite their preference and advice that [Appellant] not testify, both counsel testified that it was [Appellant's] decision and that they would have accepted any decision by [Appellant] to testify and would have proceeded accordingly.

*Id.* at 9-10 (citations omitted; paragraphing added). The court also concluded that any possible benefit from Appellant's testimony would have been outweighed by impeachment via his robbery conviction and prior inconsistent statements reflecting his untruthfulness with police and defense experts. *See id.* at 10-11.

Ultimately, the court indicated:

> This Court, having witnessed [Appellant] testify, certainly deemed him to be not credible and finds it highly unlikely [Appellant] would have presented as a credible witness at trial. . . . The record is clear in this matter that trial counsel was not ineffective since he apprised [Appellant] of his right to testify, explained the pitfalls associated with exercising that right, had a strategic basis for his advice to not testify and ultimately left the decision up to [Appellant].

*Id.* at 11.

Regarding trial counsel's failure to call Dr. Cooke as a witness, the PCRA court observed that, although the forensic psychiatrist's testimony might have been admissible, for many of the reasons discussed above, it "would not have been beneficial to the defense and, in many respects, may have been harmful given [Appellant's] strategy at trial." *Id.* at 12. The court elaborated as follows:

> [Lead counsel] stated that he considered using both Dr. Gottlieb and Dr. Cooke during the [guilt] phase of trial, but changed his mind after speaking with the experts. [Lead counsel] testified credibly that when he asked both doctors if they would be willing to support certain defenses, including "heat of passion," they both expressed an inability.
>
> While Dr. Cooke noted that [Appellant] suffers from certain personality disorders, it is well-settled that the presence of

such disorders does not automatically make such evidence relevant or admissible and certainly does not itself render a killing manslaughter. *See Com. v. Sheppard*, 648 A.2d 563, 568-69 (Pa. 1994) (stating that mere diagnosis of paranoid personality disorder does not permit reduction of offense from murder to voluntary manslaughter). Dr. Cooke's report and testimony were insufficient to support a claim of voluntary manslaughter in that he never stated [Appellant's] disorder(s) so [a]ffected [his] mind that it created a bona fide belief he was in danger and spoke more to [his] lack of ability to control his behavior and his tendency to respond to even minor provocation with physical aggression. Dr. Cooke opined that [Appellant] was capable of forming specific intent to kill at the time of the shooting and that [he] expressed he actually had a reason for pulling the trigger and that the reason was to scare people.

It could also be argued that [Appellant's] insistence, to both counsel and Dr. Cooke, that he was acting in self-defense, would have precluded the possibility of a "heat of passion" finding. *See,* [*e.g.*,] *Com v. Sheppard*, 648 A.2d at 566 (finding psychiatric/psychological testimony was not relevant or admissible to support a claim of "heat of passion" where [Appellant] testified that he acted in self-defense). Regardless, neither the opinion of Dr. Gottlieb nor the opinion of Dr. Cooke support a claim that [Appellant] was acting under sudden passion that rendered him incapable of reason.

*Id.* at 12-13.

The PCRA court also determined that Dr. Cooke's opinion would have "opened the door" to other prejudicial information, including Appellant's aggressiveness, *id.* at 13 (observing that Dr. Cooke found "that [Appellant] would be likely to react to perceived threats, including to his mere sense of masculinity, with aggression rather than just running away"), and lack of candor with his own experts, *see id.* at 13-14.

After the PCRA court issued its opinion, Appellant lodged the present appeal. In the broadest frame, we review the findings of the post-conviction court to ensure that

they are supported by the record and free from legal error. *See, e.g.*, *Commonwealth v. Ligons*, 601 Pa. 103, 123, 971 A.2d 1125, 1136–37 (2009).

## II. Claims on Appeal

### A. Counsel's Advice for Appellant to Refrain from Testifying at Trial

Appellant first maintains that his trial counsel was ineffective for advising him not to testify at the guilt phase of his trial. According to Appellant, his own testimony regarding the degree of his intoxication, the violent circumstances of the assault upon him, and his own self-asserted lack of aggressiveness would have provided essential support for the defense theory that a verdict of voluntary manslaughter was appropriate under a heat-of-passion theory. *See* Brief for Appellant at 9 ("[T]he evidentiary record was woefully inadequate to permit a jury to find that a reasonable man who was confronted with these provoking events would become impassioned and incapable of cool reflection."); *id.* at 20 ("The defense had not given the jury *any* evidence to support their finding any lesser degree of homicide, specifically 'heat of passion.'" (emphasis in original)). Contrary to the determination of the PCRA court that his testimony would have been harmful, Appellant asserts that the probative value greatly exceeded any potential prejudice.

In this regard, Appellant rejects the PCRA court's conclusion that his testimony, even if believed, would not demonstrate a killing resulting from an objective serious provocation or a killing by a person incapable of reason. By way of explanation, Appellant first highlights his post-conviction testimony demonstrating that he was "highly intoxicated at the time of the shooting." *Id.* at 10. Appellant posits that the importance of such evidence was paramount, since, in his view, juries often disregard or discount opinions based on hypothetical scenarios such as those rendered by Dr. Guzzardi. Additionally, Appellant stresses that his post-conviction testimony depicts the assault

upon him after he disrupted the rap performance as involving greater "viciousness" than was related at trial. Brief for Appellant at 43. Again, he believes that it was essential for the jury to appreciate the full forcefulness of the assault.

Appellant also claims that it would have been important for him to explain to the jurors that he had never intended to take the pistol from Hunter's apartment, but rather, he had forgotten that he had put it in his back pocket after he had removed it from the place of its concealment in Hunter's apartment. *See id.* at 11 (citing N.T., Sept. 18, 2017, at 196). Additionally, Appellant asserts that he could have provided the jurors a tenable reason why he put the gun in the alley and left it there. *See id.* at 11 (summarizing Appellant's testimony that "[h]e didn't want Hunter to know he took the gun in the first place and he didn't want to risk taking the gun into [a] store in case the police 'rolled up'" (quoting N.T., Sept. 18, 2017, at 158)). The argument segues into Appellant's recitation of his asserted perspective from the time he was removed from the center through the time of the shooting, as quoted previously from his brief. *See supra*.

In Appellant's view, lead trial counsel's sole concern in advising him not to testify was with the disclosure of Appellant's prior robbery conviction. In this respect, Appellant criticizes the PCRA court for relying upon a series of other reasons. *See* Brief for Appellant at 19 ("The PCRA Court is bound by what counsel said was his reason and not by what the Court believes could be additional reasons."). Appellant also complains that he did not have "complete disclosure" and the "full advice and counsel" of his attorney regarding the options, including potential advantages, disadvantages and

consequences of his refraining from testifying. *Id.* at 19-20 (referencing, *inter alia*, *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)).[5]

Finally, relying upon *Commonwealth v. Walker*, 110 A.3d 1000 (Pa. Super. 2015), Appellant posits that the appropriate standard for determining prejudice relative to a claim of deficient advice concerning whether a defendant should testify is not the traditional one. *See, e.g.*, *Commonwealth v. Pierce,* 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987) (explaining that prejudice is generally established by a demonstration, by a preponderance of the evidence, of a reasonable probability that, but for the deficient stewardship, the outcome of trial would have been different). Rather, Appellant argues that the appropriate threshold for prejudice is assessed according to whether the result of a petitioner's decision to waive the right to testify would have been different absent counsel's ineffectiveness. *Accord Walker*, 110 A.3d at 1005. Appellant concludes that prejudice is established here, since he presented his post-conviction testimony that, but for counsel's advice, he would have taken the witness stand at his trial.

### 1) Heat-of-Passion Voluntary Manslaughter, Generally

At the outset, we agree with the PCRA court's discernment of conceptual problems with Appellant's arguments, tracing to the defense theory at trial.

Per the Crimes Code, heat-of-passion voluntary manslaughter is delineated as follows:

> A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing

---

[5] Although Appellant cites directly to *Strickland*, the "complete disclosure" and "full advice and counsel" language appears to be taken from a discussion of a lawyer's obligations regarding plea bargains and potential sentencing exposure contained in *Boyd v. Waymart*, 579 F.3d 330, 353 (3d Cir. 2009).

he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

18 Pa.C.S. 2503(a). Under the case law, the killing must be accomplished with specific intent to bring about the victim's death. *See, e.g.*, *Commonwealth v. Mason*, 474 Pa. 308, 311, 378 A.2d 807, 808 (1977) ("[A] necessary element of both murder in the first degree and voluntary manslaughter is the specific intent to kill.").[6]

As noted, however, Appellant testified at the post-conviction hearing that, regardless of the assault upon him, he never intended to shoot or kill the victim or anyone else. *See* N.T., Sept. 18, 2017, at 179. But the jury at Appellant's trial was instructed, consistent with the decisional law, that in order to secure a verdict of heat-of-passion voluntary manslaughter, the defendant must have intended the killing. *See, e.g.*, N.T., May 10, 2012, at 552 (reflecting the trial court's instruction defining voluntary manslaughter as requiring "the intent to kill" and explaining that "[v]oluntary manslaughter is basically an *intentional killing* for which malice is not proven because of passion or provocation" (emphasis added)). Accordingly, a material facet of Appellant's post-conviction testimony is irreconcilably inconsistent with the position the defense asserted at trial and which is advanced in his present brief, *i.e.*, that Appellant was not guilty of first-degree murder but had instead committed voluntary manslaughter. *See, e.g.*, *Mason*, 474 Pa. at 311, 378 A.2d at 808.

---

[6] When the defendant "endeavors to kill" a person other than the victim, but negligently or accidentally causes the victim's death, the specific intent element is made explicit in the statute. 18 Pa.C.S. §2503(a). Again, in the present case, it was the Commonwealth's theory that Appellant intended to kill Wright but accidentally shot the victim.

Significantly, Appellant also does not now contend that trial counsel disregarded any contemporaneous assertion, by him, that he did not intend the killing. Nor does he posit that counsel should have pursued a verdict other than voluntary manslaughter, including an acquittal, or that counsel should have requested a different jury charge at his trial. Thus, it appears that Appellant is implicitly suggesting that the jury could have accepted the Commonwealth's contention that he acted with a specific intent to kill and rejected his own testimony that he lacked such intent, but the jury still could have pieced together a voluntary manslaughter verdict by otherwise crediting his testimony that he acted from intense fear and lacked malice. In other words, the jury could have believed him in part.

Trial counsel's tactic was to leave the specific intent element essentially uncontested by the defense, which is a strategy also attended by some risk. Of course, the present case was always fraught with risk in all events, since the Commonwealth possessed compelling evidence that Appellant shot at an unarmed man while not under any immediate threat of any harm and with an avenue for retreat. In any event, it is plain that Appellant's testimony would have exacerbated the many difficulties involved in singularly advancing a heat-of-passion defense in the circumstances presented in this case by explicitly placing the specific intent element into controversy. And although this may not be entirely disabling for Appellant, since the jury would have been free to accept part but not all of his testimony, we are quite circumspect about the argument that a defense attorney might render deficient stewardship by failing to encourage the advancement of testimony that is materially inconsistent with the defense's sole theory of the case.[7]

---

[7] Parenthetically, trial counsel testified that Appellant had wished to pursue a claim of self-defense, that counsel deemed this "a bridge too far," and that the defense had ultimately settled on the heat-of-passion theory. *See* N.T., Sept. 18, 2017, at 112, 136. (continued…)

In terms of the objective/subjective aspects of the heat-of-passion inquiry, Appellant does recognize in the abstract that there is an objective component. *See, e.g.*, *McCusker*, 448 Pa. at 398-90, 292 A.2d at 290 ("The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, [would become] impassioned to the extent that his mind was 'incapable of cool reflection.'"). His arguments nonetheless ultimately devolve into a treatment of his unique, personal mental state, and it is mostly from this subjective frame of reference that Appellant attempts to demonstrate that a reasonable person confronted with the circumstances surrounding the victim's death would have been susceptible to acting as he did.[8] The absence of any reasonably developed argument, relative to adequate provocation, that does not intermix subjective factors into the objective inquiry further militates against Appellant's claim.

### 2) Voluntary Intoxication

We proceed to consider Appellant's present emphasis on his drug and alcohol consumption, which is problematic not only because it ties into Appellant's subjective state of mind, but also on account of legal constraints upon the use of evidence of voluntary intoxication as a defense to criminal liability.

_____

(…continued)
Counsel's assessment relative to self-defense was plainly an apt one, *see supra* note 4 and accompanying text, and Appellant does not challenge it here.

[8] *See, e.g.*, Brief for Appellant at 9-10 (framing the second element of heat-of-passion voluntary manslaughter as requiring that "a *reasonable man* who was confronted with these provoking events would become impassioned," and contending that Appellant's drug and alcohol consumption would have "been important evidence" in support of that element (emphasis added)); *see also id.* at 23 ("Expert psychological testimony was necessary to help the jury understand [Appellant's] *subjective* state of mind." (emphasis added)); *accord* Brief for Appellee at 22 ("[Appellant's] argument appears to be premised on the notion that the adequacy of the provocation should be assessed using a subjective standard.").

In this regard, the trial court instructed the jury that voluntary intoxication and/or a "drugged condition" are relevant only as to whether a defendant is capable of forming specific intent to commit first-degree murder. N.T., May 10, 2012, at 547; *cf.* 18 Pa.C.S. §308. *See generally Commonwealth v. Breakiron*, 524 Pa. 282, 295-96, 571 A.2d 1035, 1041 (1990) (quoting *Commonwealth v. England*, 474 Pa. 1, 19-20, 375 A.2d 1292, 1301 (1977)).[9] Furthermore, the court charged the jurors that:

> The general rules apply to lesser crimes. They prevent a defendant from using his or her own voluntary intoxication or drugged condition *in any way* to defend him or herself against an accused -- an accusation of third-degree murder or voluntary manslaughter.

N.T., May 10, 2012, at 547 (emphasis added); *accord Breakiron*, 524 Pa. at 295-96, 571 A.2d at 1041; *cf. United States v. Hatatley*, 130 F.3d 1399, 1405 (10th Cir. 1997) ("[E]xpert testimony on intoxication would be irrelevant, if not entirely improper, in relation to general intent crimes such as . . . voluntary manslaughter where intoxication is no defense.").[10]

---

[9] Section 308 of the Crimes Code restricts the admissibility of evidence of voluntary intoxication relative to proof of *intent*, *see* 18 Pa.C.S. §308, but, at least by its terms, it does not affect admissibility concerning other issues, for example, identity. The trial court's treatment, however, deriving from the decisional law, expressed the prohibition in broader terms. We are not called upon in this case to address this inconsistency, particularly since the issue before the trial court, and now in the post-conviction proceedings, pertains to an intent element -- specifically malice -- in any event. *See Commonwealth v. Young,* 494 Pa. 224, 227, 431 A.2d 230, 232 (1981) ("Malice is one of the essential elements of third degree murder, and it is the distinguishing factor between murder and manslaughter." (citation omitted)); *Commonwealth v. Weinstein*, 499 Pa. 106, 115, 451 A.2d 1344, 1348 (1982) ("Malice aforethought is the *general intent* prerequisite to a finding of murder." (emphasis added)).

[10] As previously noted, in Pennsylvania, per this Court's decisional law, heat-of-passion voluntary manslaughter is, in the first instance, a specific intent crime. *See, e.g.*, *Mason*, 474 Pa. at 311, 378 A.2d at 808. This facially distinguishes cases, such as *Hatatley*, from jurisdictions in which manslaughter is treated as a general intent crime. (continued…)

Accordingly, both at trial and in our present review, Appellant's own testimony about his voluntary intoxication could not and cannot be relied upon as support for the defense theory of the case, namely that Appellant acted under the influence of intense passion rather than with malice. Therefore, counsel will not be deemed ineffective for failing to present additional evidence of this kind.[11]

---

(…continued)
Nevertheless, the element in question -- as concerns the effort to secure a reduction from murder to manslaughter -- is the general intent element of malice. *See supra* note 9 (citing *Young* 494 Pa. at 227, 431 A.2d at 232, and *Weinstein*, 499 Pa. at 115, 451 A.2d at 1348).

[11] We emphasize that Appellant does not presently criticize his trial counsel's attempt to rely on evidence of voluntary intoxication in support of a voluntary-manslaughter verdict. Rather, he seeks to bolster the case that was presented at trial via the assertion that his own testimony would have provided further support. *See, e.g.*, Brief for Appellant at 10 ("Had [Appellant] testified, he would have told the jury about his drug and alcohol consumption that day and that he was highly intoxicated at the time of the shooting. This would have been important evidence in support of . . . the 'heat of passion' test.").

Furthermore, Appellant does not contend that counsel was ineffective in failing to present more evidence of intoxication in an effort to reduce the verdict from first- to third-degree murder, perhaps at least partially in light of the elevated threshold for such arguments. *See, e.g.*, *Breakiron*, 524 Pa. at 296, 571 A.2d at 1041 (explaining that a defendant must demonstrate that he was "overwhelmed to the point of losing his faculties and sensibilities" to establish a voluntary intoxication defense to first-degree murder).

As a final observation, we appreciate that this Court has never squarely reconciled the *Breakiron* line of cases, to the degree these cases foreclose the use of voluntary intoxication *in any way* to negate malice, with the decision in *McCusker*, which permits evidence of defendant's subjective state of mind relative to malice. *But cf. Commonwealth v. Bridge*, 495 Pa. 568, 578-79, 435 A.2d 151, 156-57 (1981) (citing *McCusker* during the course of a treatment of voluntary intoxication in the voluntary-manslaughter context). To the extent there is tension, we leave the reconciliation for another day, given that the matter is nuanced and beyond the scope of the present briefing.

### 3) The PCRA Court's Disposition

Finally, we agree with much of the remaining reasoning and the core conclusion of the PCRA court's opinion. According to his credited post-conviction testimony, lead trial counsel met with Appellant often. *See* N.T., Sept. 18, 2017, at 77. Appellant was non-cooperative in many respects, including his insistence, for five months into the representation, that Hunter, and not he, perpetrated the killing. *See id.* at 130. When the discussions progressed to the point that Appellant finally accepted what the evidence convincingly demonstrated -- namely, that he was the shooter -- Appellant took the position that he acted in self-defense in shooting at an unarmed man from an elevated position with an open avenue of retreat. *See id.* at 112.[12]

Appellant makes some fair points in that counsel either did not remember discussing with him, or may not have exhaustively discussed, *all* potential advantages and drawbacks associated with presenting Appellant's testimony at trial. Additionally, the PCRA court did, to some extent, attribute reasons to trial counsel to which they did not testify. But, in the end, in the landscape with which we have been presented -- in which heat-of-passion voluntary manslaughter is the only option on account of the post-conviction advocacy for that theory only -- the case on post-conviction is so weak that we find the claim to be lacking in arguable merit. *See supra* note 1.[13] In this regard, we

---

[12] The references to an "elevated position" stem from the fact that Appellant shot from the alleyway down into a sunken patio behind the center. *See, e.g.*, N.T., Sept. 18, 2017, at 194. Appellant conceded on post-conviction that he could have retreated, albeit that he added that Wright and others "could have took chase." *Id.* at 195.

[13] It would seem that the option to pursue a verdict of third-degree murder might have been preferable, but of course counsel in these scenarios are confronted with many difficulties in discussing the limited range of reasonable options with clients in homicide cases in which identity simply is not an issue and a justification defense is implausible. And certainly clients often will have a different perspective concerning the options, in hindsight, after a guilty verdict has been rendered.

rely both on the conceptual difficulties with Appellant's position and the PCRA court's factual assessment of the post-conviction evidence, as discussed above. Most specifically, we are in full accord with the court's judgment that the prospect of harm from Appellant testifying was substantial.[14]

Consistent with the PCRA court's disposition, we also find that Appellant fails to demonstrate a reasonable probability of a different outcome of his trial that would undermine confidence in the guilt-phase verdict. *See Pierce*, 515 Pa. at 157, 527 A.2d at 974 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). We recognize, as Appellant highlights, that the Superior Court's *Walker* decision applies a different prejudice standard derived from prior decisions of this Court. *See Walker*, 110 A.3d at 1005 (holding that prejudice, relative to a claim of deficient stewardship in advising a defendant not to testify at trial, is assessed according only to whether or not the defendant would have testified had fuller advice been rendered). We decline, however, to consider here whether that standard is the correct one to apply generally to claims of deficient stewardship associated with legal advice discouraging a defendant from testifying at trial. We do so, in part, because the Commonwealth has not presented any advocacy for or against the particularized *Walker* standard.

Instead, we simply conclude that the *Walker* standard cannot apply in this particular case, given the pervasive weaknesses in Appellant's argument throughout. It would simply be unreasonable to afford Appellant a new trial to present a heat-of-

---

[14] That said, again, we appreciate that the trial court's instructions negated a main thrust of the defense (*i.e.*, reliance on Appellant's voluntary intoxication). Accordingly, consistent with the tenor of the PCRA court's decision, our reasoning here is that cross-examination of Appellant, *inter alia*, about his prior robbery conviction and prior inconsistent statement would likely have further reduced whatever chance the defense might have had to secure a heat-of-passion voluntary manslaughter verdict in the first instance.

passion theory to a jury which is inherently weakened by his own testimony that he never intended to shoot anyone; that is stripped of a main element of Appellant's present argumentation concerning his voluntary intoxication; and which encompasses an objective criterion that Appellant wishes to address through a discussion of subjective factors. Application of the *Walker* standard here would also preclude us from giving any effect to the substantial evidence of Appellant's consciousness of guilt (including fleeing the scene and being untruthful with police), and the PCRA court's abundantly reasonable conclusion that jurors would have been (and would be) skeptical of Appellant's self-serving testimony. He simply faces too many hurdles otherwise to relieve him of the obligation to establish that, but for the asserted lack of completeness in his counsel's advice, there is a reasonable probability the outcome of the proceedings would have been different.

We realize that the above and some other apparent misunderstandings reflected in Appellant's brief, as discussed below, are problematic. The present forum, however, is not available to consider the appropriateness of redress relative to the stewardship of post-conviction counsel. *See Commonwealth v. Pitts*, 603 Pa. 1, 9 n.4, 981 A.2d 875, 880 n.4 (2009).

## B. Trial Counsel's Failure to Call Dr. Cooke as a Guilt-Phase Witness

Appellant next faults his trial attorney for failing to call Dr. Cooke as an expert witness to testify to Appellant's mental state, including his intoxication and personal susceptibility to passion. *See, e.g.,* Brief for Appellant at 27 ("Dr. Cooke could have testified that [Appellant's] consumption of drugs and alcohol prior to the crime not only gave [Appellant] poor control of his impulses and decreased processing of things around him, it also exacerbated his paranoid perceptions."). Even putting aside the conceptual difficulties discussed in Part II(A) above, however, the PCRA court credited

trial counsel's post-conviction testimony that the defense expert witnesses -- including Dr. Cooke -- indicated in pre-trial discussions that they could not support the claim that Appellant acted in the heat of passion. *See Towles*, No. 2879-2010, *slip op.* at 12 (citing N.T., Sept. 18, 2017, at 101-107, 144-149). In this respect and more broadly, the court also reasonably observed that Dr. Cooke's testimony would likely have harmed the defense case. *See id.* at 13-14.

Moreover, we reiterate that, although under *McCusker* a defendant is permitted to present psychiatric evidence of his personal state of mind to establish that he acted in the heat of passion, *objective* provocation remains a required threshold. *See McCusker*, 448 Pa. at 389-95, 292 A.2d at 290-93. Appellant's own pervasive focus on his subjective mental state exposes the great difficulty in conceptualizing the circumstances surrounding the killing of the victim as fear-based provocation adequate, from a standpoint of objective reasonableness, to result in the shooting of an unarmed man from an elevated position, despite an open avenue for retreat.

## C. Counsel's Failure to Lodge a Particular Objection to the Striking of Two Jurors

Appellant contends that his trial counsel rendered deficient stewardship by failing to object to the Commonwealth's exercise of peremptory strikes for Jurors 25 and 31 on the basis of alleged gender discrimination. Appellant highlights that, in his direct appeal, this Court found the identical claim to have been waived. *See Towles*, 630 Pa. at 201, 106 A.3d at 601.

A material difficulty with Appellant's argument is that, despite the determination of waiver, this Court nevertheless engaged in a merits resolution of the underlying claim of gender discrimination. *See id.* at 201-02, 106 A.3d at 601-02 (crediting the trial court's determination that "even if appellant's gender-based claims were preserved, the Commonwealth gave sufficient race-neutral and gender-neutral reasons for its

peremptory challenges and demonstrated no purposeful discrimination"). *See generally Commonwealth v. Markman,* 591 Pa. 249, 282, 916 A.2d 586, 606 (2007) (quoting *Commonwealth v. Swing,* 409 Pa. 241, 245, 186 A.2d 24, 26 (1962), for the proposition that "[w]here a decision rests on two or more grounds equally valid, none may be relegated to the inferior status of obiter dictum")). Accordingly, the underlying claim is previously litigated and not a proper subject for post-conviction relief. *See* 42 Pa.C.S. §9543(a)(3) (reflecting the requirement that a PCRA petitioner must demonstrate "[t]hat the allegation of error has not been previously litigated or waived").

### D. Video Evidence

Appellant's next claim is that his trial counsel were ineffective for various failures relating to video recordings.

By way of background, as part of the Commonwealth's case in chief, the prosecutor presented a video disc containing recordings of some of the events inside the center, including a segment showing Appellant interrupting the rap performance by Wright and the victim. This was introduced through the testimony of Jerry Puryear, one of two persons from whom the Commonwealth had secured the footage. *See* N.T., May 8, 2012, at 168-181. The other individual was Robert Sanders, who had not been called as a trial witness.

In the post-conviction proceedings, Appellant lodged a prehearing discovery request seeking an examination, by an expert, of the video footage to determine whether it had been tampered with.[15] The PCRA court denied the request.

---

[15] Appellant's motion appears to be missing from the original record, but the Commonwealth's response is included.

At the post-conviction hearing, Appellant attempted to call Puryear as a witness, but Puryear's counsel indicated that he would invoke his right against self-incrimination. *See* N.T., Sept. 18, 2017, at 121. Sanders testified, however, and he related that he had filmed some of the events that occurred prior to the killing. Additionally, he explained that, although he did not recall stopping the filming at any point, he did not remember if his camera was still active when the physical altercation occurred inside the center. *See id.* at 27. Sanders also indicated that he had dropped his camera after the shooting and lost it, and that it was returned to him a few days later. *See id.* at 28-29.

Notably, both of Appellant's trial attorneys did express a belief that portions of the video filmed by Sanders may have been missing. *See id.* at 50, 88. Nevertheless, lead counsel thought it would be counterproductive to call Sanders as a witness at trial, since he had presented an unfavorable eyewitness perspective on the shooting to police. *See id.* at 90, 101.

Presently, Appellant suggests that portions of the videos critical to the defense had been deleted. Specifically, he asserts that the missing footage would have demonstrated his own lack of aggression and that he "had been 'rushed' and set upon by a group of people who joined in, hitting and kicking him while he was being held in a choke hold by Wright." Brief for Appellant at 36; *see also id.* at 43 ("Had the jury seen for themselves the viciousness of the assault on [Appellant] inside the Center [the jurors] would have likely found that [Appellant] had adequate provocation to establish his heat of passion defense."). Appellant relies on trial counsel's post-conviction testimony that it "would have been really, really important" for the jurors to have seen the altercation inside the center for themselves. N.T., Sept. 18, 2017, at 79.

Accordingly, he faults counsel for having failed to obtain an expert to examine the original footage to determine whether the missing portions could be recovered.

Appellant appreciates that it is his burden to establish prejudice and that without any evidence that there was missing footage that could actually be restored, he cannot do so. In this regard, however, Appellant criticizes the PCRA court for denying his discovery request. He explains, as follows:

> The PCRA court held that the instant claim was entirely speculative. That is because the PCRA Court denied [Appellant's] pre-PCRA hearing discovery request to permit him to have the original footage examined by an expert, thus limiting present counsel's ability to do more than speculate as to what would be on that footage. The PCRA Court cannot deny [Appellant] the ability to present more definitive evidence and at the same time find the claim is too speculative. [Appellant] avers that exceptional circumstances existed which would have permitted this post-conviction discovery.

Brief for Appellant at 35. Appellant also asserts that, if the jurors had known that the recordings were incomplete and had been altered, they could have accorded the footage lesser weight in their guilt-phase determination. *See id.* at 43.

Discovery in a first counseled post-conviction petition in a death penalty case is permitted only "after a showing of good cause." Pa.R.Crim.P. 902(E)(2). A petitioner must make "more than just a generic demand for potentially exculpatory evidence that might be discovered if the petitioner is permitted to review requested materials." *Commonwealth v. Chambers*, 570 Pa. 3, 32, 807 A.2d 872, 889 (2002). On appellate review, a petitioner challenging a PCRA court's discovery ruling must establish that the court abused its discretion, and a deferential review standard pertains. *See, e.g.*, *Commonwealth v. Baumhammers,* 599 Pa. 1, 45, 960 A.2d 59, 86 (2008) (explaining that "[d]iscretion is abused when the course pursued represents not merely an error of

judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will" (quoting *Commonwealth v. Widmer*, 560 Pa. 308, 322, 744 A.2d 745, 753 (2000))).

Here, reasonable minds might differ as to whether Appellant should have been permitted to examine the video evidence, particularly as his trial counsel had contemporaneous concerns that there may have been some alteration. Nevertheless, applying the deferential standard of review, we find no abuse of discretion.

Initially, the trial evidence establishing that Appellant was hit "very hard" in the head several times by Wright is at least roughly consistent with the statement Appellant himself gave to police. N.T., May 8, 2012, at 155; *see also* N.T., May 9, 2012, at 374 (reflecting Appellant's statement to police that "[a] big fight broke out and someone swung on me. I went down and covered up. Somebody grabbed the guy that swung on me.").

To the degree that Appellant's post-conviction version of the events would be believed, *i.e.*, that he was attacked by a substantial crowd that surrounded him, even by his own testimony the scene was chaotic and the event somewhat fleeting. *See* N.T., Sept. 18, 2017, at 171-172. In the circumstances, the likelihood that a camera operator would have captured Appellant's image amidst a surrounding crowd would seem to be questionable. Moreover, as the prosecutor emphasized in his closing remarks, there was no evidence that Appellant bore any injuries as a consequence of the assault upon him. *See, e.g.*, N.T., May 10, 2012, at 520-521. And ultimately, through Wright and otherwise, trial counsel did ably develop that Appellant had been subjected to a violent assault. In all events, the defense still would have been confronted with the force of the Commonwealth's argument:

[W]e actually had a little debate here, well, it's two or three punches. Say it's a hundred punches. . . . [Y]ou get the point.

That is not reasonable provocation. That is not provocation that a reasonable individual would say, you know, now I'm going to kill this person. Those are fights that happen in school yards.

*Id.* at 513-14 (reflecting closing remarks of the prosecutor at trial).

As the PCRA court's discretionary discovery ruling will not be overturned, Appellant cannot establish prejudice in the form of allegedly missing evidence.

### E. Trial Counsel's Cross-examination of Robinson

Appellant proceeds to criticize his lead trial counsel's cross-examination of Commonwealth witness Antwain Robinson. In the portions of Robinson's testimony material to this claim, Robinson testified that, prior to the pair's arrival at Hunter's apartment, Appellant had stated that he wanted to take Hunter's gun. *See id.* at 282-83. Robinson also indicated that he left the center after Appellant was escorted from the hall. *See Id.* at 294-95. Robinson further related that, upon returning to Appellant's place of residence subsequent to the killing, Appellant asked his mother for money so that he could leave town. *See id.* at 304-305. The Commonwealth and the defense stipulated that Robinson had not "told [police] everything" in a statement that he gave before trial. *See* N.T., May 9, 2012, at 403.

Appellant explains that Robinson gave three statements to police on three different days, and there were multiple discrepancies between them. Appellant faults his trial counsel for failing to confront Robinson with those discrepancies.

First, Appellant observes that it was not until his third statement to police that Robinson had related that, on the way to Hunter's apartment, Appellant had said that he

wanted to take Hunter's gun. According to Appellant, this admission prejudicially implied premeditation on his part. *See* Brief for Appellant at 44.

Next, Appellant depicts an evolution in Robinson's statements concerning how Appellant came to be in possession of Hunter's gun. He highlights that it was not until the third statement that Robinson said that he had observed Appellant taking the pistol from a hiding place in Hunter's apartment. Appellant reasons that counsel could have therefore suggested to the jury that Robinson's memory was faulty, that he was untruthful, or that he was "provided the additional information and/or had seen other evidence." *Id.* at 45. Along these lines, Appellant explains that a similar transformation took place with respect to Robinson's statements and ultimate testimony concerning Appellant's concealment of the pistol in the alleyway. According to Appellant, Robinson's testimony "very prejudicially placed the gun in [Appellant's] possession." *Id.* at 46.

Appellant also delineates discrepancies, among Robinson's statements, concerning whether Robinson or Appellant left the center first. He argues that Robinson's trial testimony that he came out after appellant prejudicially implied that Appellant may have been lying in wait for the victim. *See id.* at 47.[16]

Additionally, Appellant complains that his trial attorney failed to elicit from Robinson a statement that he gave to police indicting that Appellant had said to his mother: "Someone tried to fight me at the party, I had to do what I had to do." *Id.* at 47 (citation omitted). From Appellant's perspective, such testimony would have aided in establishing and corroborating Appellant's state of mind at the time of the killing.

---

[16] Since neither the Commonwealth nor Appellant have ever contended that Appellant intended to do harm to the victim, Appellant's reference in this passage is more aptly understood to refer to Wright.

Finally, Appellant disapproves of his trial attorney's stipulation that Robinson "hadn't told [police] everything in the first statement." N.T., May 9, 2012, at 403. According to Appellant, this stipulation "effectively made [Robinson's] third statement appear to be an admission/conceded truth." Brief for Appellant at 48. Ultimately, Appellant posits that counsel's actions and inactions served to bolster the weight and credibility of Robinson's prejudicial testimony.

In addressing these contentions, the PCRA court first noted that Robinson's statement concerning Appellant's prior interest in the gun did not imply premeditation, "[e]specially considering that [Appellant] did not shoot or attempt to shoot anyone with [whom] he had any prior connection or relationship." *Towles*, No. 2879-2010, *slip op.* at 17-18. The court further explained that attempting to impeach numerous portions of Robinson's testimony would have been unproductive, since there was ample corroboration throughout the evidentiary record, and potentially counterproductive, since Robinson was privy to more prejudicial information than was presented to the jurors. *See id.* at 18-19 (explaining, as an example, that "Mr. Robinson had previously told law enforcement that [Appellant] told his mother that he had, in fact, shot someone and that he saw a body drop");[17] *accord* N.T., Sept. 18, 2017, at 100 (reflecting trial counsel's testimony that the Commonwealth had performed "a very cursory examination of Mr. Robinson" and did not delve into "a lot of incriminating things"). Additionally, the court explained that counsel had adduced Robinson's concession that his memory was adversely affected by a previous head injury; that he had himself consumed substantial quantities of alcohol and drugs that evening; and that he had a prior *crimen falsi*

---

[17] This information squarely conflicts with Appellant's post-conviction explanation that he only learned the next day that a bullet had hit anyone. *See* N.T., Sept. 18, 2017, at 181.

conviction.  *See id.* at 19-20.  With regard to the stipulation, the PCRA court found that it was supportive of the defense challenge to Robinson's credibility.  *See id.* at 18.

Upon our review of the record, we find the PCRA court's rationale to be supported by the record and free from legal error.  In this regard, we agree with the determination that Appellant has failed to demonstrate that the judgments made by counsel fell outside the "wide range of reasonable professional assistance."  *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

## F.  Constitutionality of the Death Penalty in View of Appellant's Age

Appellant next maintains that a sentence of death cannot be constitutionally imposed on a person who was twenty years old at the time he committed the capital crime.  In this regard, Appellant cites *Roper v. Simmons*, 543 U.S. 551, 574, 125 S. Ct. 1183, 1198 (2005) (holding that the Eighth Amendment prohibits application of the death penalty to offenders who were younger than eighteen years of age at the time of the offense), and *Miller v. Alabama*, 567 U.S. 460, 465, 132 S. Ct. 2455, 2460 (2012) (same, for life imprisonment without the possibility of parole).

Appellant recognizes that the Supreme Court of the United States determined that "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood" and is "the age at which the line for death eligibility should rest."  *Roper*, 543 U.S. at 574, 125 S. Ct. at 1198.  He premises his argument, however, upon a state intermediate appellate court decision applying the proportionate penalties clause of the Illinois Constitution.  *See People v. House*, 72 N.E.3d 357 (Ill. App. 2015).

As the Commonwealth explains, however, the Illinois Supreme Court directed the Illinois Appellate Court, First District, to vacate its decision in *House* and to consider the

effect of *People v. Harris*, 120 N.E.3d 900 (Ill. 2018). *See People v. House*, 111 N.E.3d 940 (Ill. 2018) (*per curiam*). In *Harris*, the Illinois Supreme Court stated:

> [W]e note that claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected. We agree with those decisions and our appellate court that, for sentencing purposes, the age of 18 marks the present line between juveniles and adults.

*Harris*, 120 N.E.3d at 914 (citations omitted).

Appellant also does not disclose that the intermediate appellate court's decision in *House* was an as-applied ruling premised, in substantial part, upon the appellant's conviction for murder on an accountability theory premised upon his status as only a lookout, during a shooting, who never handled a gun. *See House*, 72 N.E.3d at 389. This is obviously a material distinguishing factor, relative to Appellant, who himself shot an unarmed man. Appellant further fails to discuss any provision of the Pennsylvania Constitution.

As explained by the PCRA court, the post-conviction arena does not generally offer a forum to innovate new principles of constitutional law. *See, e.g.*, *Commonwealth v. Robinson*, 623 Pa. 345, 384-85, 82 A.3d 998, 1021-22 (2013). In terms of federal constitutional doctrine, we apply the ruling of the Supreme Court of the United States setting the age of death eligibility at 18. As to the Pennsylvania Constitution, we find Appellant's claim to be too poorly developed for further consideration here.

### G. Cumulative Impact

Finally, Appellant argues that his constitutional rights to due process of law and a fair trial have been violated by the cumulative impact of the above claims. *See Commonwealth v. Johnson,* 600 Pa. 329, 344-45, 966 A.2d 523, 532 (2009) (explaining that cumulative prejudice from multiple instances of deficient performance may properly

be assessed in the aggregate when the individual claims have failed due to lack of prejudice).  Regarding the claims that we have discussed in terms of the prejudice component of the ineffectiveness inquiry, however, we conclude that prejudice has not been demonstrated, either on an individual basis or in the aggregate.

For the above reasons, the order of the post-conviction court is affirmed.

Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.