IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 796 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | May 5, 2022 in the Court of |
| | : | Common Pleas, Lancaster County, |
| v. | : | Criminal Division at No. CP-36-CR- |
| | : | 0002879-2010. |
| | : | |
| JAKEEM LYDELL TOWLES, | : | SUBMITTED: December 2, 2022 |
| | : | |
| Appellant | : | |

## OPINION

**JUSTICE BROBSON**                                        **DECIDED: AUGUST 22, 2023**

This is a capital case in which Jakeem Lydell Towles (Towles) appeals from an order dismissing his second petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. C.S. §§ 9541-9546. In ordering dismissal, the Court of Common Pleas of Lancaster County (PCRA court) concluded that Towles' petition was untimely filed and, alternatively, without merit. For the reasons that follow, we affirm.

## I. BACKGROUND

On May 7, 2010, Towles and his friend, Antwain Robinson (Robinson), took a bus from Lancaster to Columbia, Pennsylvania, where the Mighty Dog Family Fun Center (Center) was hosting a local rap performance by Cornell Anton Stewart, Jr., (Stewart) and John Wright (Wright) that night. Towles' cousin, Tyrone Hunter (Hunter), lived in an apartment close to the Center. Throughout the evening following the arrival of Towles and Robinson in Columbia, the men drank alcohol and smoked marijuana, walking

between the Center, Hunter's apartment, and another venue several times. At some point, Towles took Hunter's handgun from the apartment and hid it in a nearby alley.

Stewart and Wright started their performance at the Center sometime after 10:00 p.m. After the performance began, however, Towles interrupted it by grabbing Wright's microphone. An altercation ensued, with Wright hitting Towles at least once. Security and other individuals separated the men. Security then escorted Towles and Robinson out the front of the Center and escorted Wright and Stewart out the back of the Center. After being escorted out, Towles retrieved the gun he had hidden earlier, went to the alleyway behind the Center, and fired three shots at Wright and Stewart. One of the bullets struck Stewart in the head. Towles and Robinson then fled the scene in different directions but reunited at an apartment complex, where they asked Arpasia Bridgman (Bridgman) for a ride back to Lancaster. Bridgman, who was leaving for the evening with two friends, agreed. During the trip, Towles made incriminating statements and warned the occupants of the vehicle (including Robinson) not to talk. Stewart ultimately died from the gunshot wound to his head.

The Commonwealth of Pennsylvania (Commonwealth) charged Towles with the homicide of Stewart, the attempted homicide of Wright, and unlawful possession of a firearm. The Commonwealth filed its notice of an aggravating circumstance and intent to seek the death penalty. The matter proceeded to a jury trial, at which Robinson, Hunter, Wright, Bridgman, and others testified for the Commonwealth. Following trial, the jury found Towles guilty of first-degree murder and attempted homicide.[1] At the penalty phase, the jury returned a sentence of death. The trial court formally imposed sentence on June 11, 2012. Towles then filed a post-sentence motion, which the trial court denied. This Court affirmed Towles' judgment of sentence on direct appeal on

---

[1] The firearm offense was severed from the homicide charges and ultimately *non prossed*.

September 22, 2014, and the United States Supreme Court denied Towles' subsequent petition for writ of certiorari on March 2, 2015. *Commonwealth v. Towles* (*Towles I*), 106 A.3d 591 (Pa. 2014), *cert. denied*, 574 U.S. 1193 (2015).[2] Towles subsequently filed his first PCRA petition, which, notably, included a claim that his trial counsel was ineffective for failing to cross-examine Robinson on discrepancies between statements Robinson gave to police after the incident and for stipulating at trial that Robinson had not told police everything in his first statement.[3] *See Commonwealth v. Towles* (*Towles II*), 208 A.3d 988, 1007-08 (Pa. 2019). The PCRA court denied Towles' PCRA petition following a hearing (First PCRA Hearing), and, on May 31, 2019, this Court affirmed the PCRA court's denial of relief. *Id.* at 992, 1009.

On May 4, 2020, Towles filed his second PCRA petition.[4] Therein, Towles claimed that the Commonwealth had made threats and promises to Robinson to induce him to

---

[2] The Lancaster County Office of the Public Defender (PD's Office) represented Towles during trial and on direct appeal. Specifically, Samuel G. Encarnacion, Esquire, represented Towles during the guilt phase of his trial; Patricia K. Spotts, Esquire, represented Towles during the penalty phase; and James J. Karl, Esquire, represented Towles on appeal.

[3] The PCRA court appointed various counsel to represent Towles during the course of proceedings on Towles' first PCRA petition, including, at one point, the Capital Habeas Corpus Unit of the Federal Community Defender Office for the Eastern District of Pennsylvania (FCDO). Ultimately, Towles retained private counsel, Teri B. Himebaugh, Esquire, to represent him in the remainder of those proceedings.

[4] On February 11, 2020, Towles filed a federal *habeas corpus* petition through FCDO, which the United States District Court for the Eastern District of Pennsylvania appointed to represent Towles in federal proceedings by order on August 11, 2015. Subsequently, Towles filed a motion for stay and abeyance of the federal proceedings so that he could attempt to exhaust his state court remedies on one claim not previously presented in state court. The federal district court granted Towles' motion and ordered that Towles move for relief in state court no later than May 4, 2020, the date upon which Towles' filed his second PCRA petition. On that same date, FCDO re-entered its appearance for Towles in the instant matter.

testify against Towles at trial and violated *Brady v. Maryland*, 373 U.S. 83 (1963),[5] and its progeny by failing to disclose that information. In apparent recognition of the facial untimeliness of his second PCRA petition,[6] Towles asserted that his petition met the so-called "governmental interference" and "newly discovered facts" timeliness exceptions set forth in Section 9545(b)(1)(i)-(ii) of the PCRA, 42 Pa. C.S. § 9545(b)(1)(i)-(ii). Towles further claimed that he acted with due diligence in asserting his claim within the one-year time limit under Section 9545(b)(2) of the PCRA, 42 Pa. C.S. § 9545(b)(2). Towles also

---

[5] As this Court has explained:

> It is well-settled that *Brady* and subsequent precedent flowing therefrom impose[] upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused. *Commonwealth v. Strong*, . . . 761 A.2d 1167, 1171 & n.5 ([Pa] 2000). . . . [T]o establish a *Brady* violation, a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material, meaning that prejudice must have ensued.
> . . . .
>
> [W]e have observed that "due process requires the jury to be informed of any promise or understanding that the government would extend leniency in exchange for a witness's testimony." *Commonwealth v. Chmiel*, . . . 30 A.3d 1111, 1131 ([Pa.] 2011). Indeed, "[a]ny implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility."

*Commonwealth v. Bagnall*, 235 A.3d 1075, 1085-86 (Pa. 2020) (some citations omitted).

[6] As a general matter, all PCRA petitions must be filed within one year of the date that the petitioner's judgment of sentence becomes final to be deemed timely filed. Section 9545(b)(1) of the PCRA, 42 Pa. C.S. § 9545(b)(1); *Commonwealth v. Marshall*, 947 A.2d 714, 719 (Pa. 2008). The PCRA dictates that "a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa. C.S. § 9545(b)(3). It is undisputed that Towles' second PCRA petition is facially untimely, as he filed it more than five years after his judgment of sentence became final in 2015.

requested a hearing and filed an appendix to his second PCRA petition. The appendix contained an affidavit from Robinson, which is dated March 5, 2020, and provides:

> My name is Antwain Robinson. I testified at Jakeem Towles['] trial in Lancaster. I was with Jakeem the night of the incident. I don't remember all the details of that day. What I do remember is that the investigators threatened me that if I did not cooperate with them and testify at Jakeem Towles'[] trial, I could be charged with crimes related to the incident and could go to jail. I believed them and I was scared. So I did testify at the trial.

(Original Record (O.R.), Item No. 81, Appendix to Petition, Ex. 1.) The appendix also contained two memoranda exchanged between Towles' trial counsel and an investigator from the PD's Office, Peter Glatfelter (Glatfelter), indicating that Glatfelter attempted to speak to Robinson about the incident twice before trial but was not successful. In the first memorandum, Glatfelter explained that on April 25, 2011, he asked Robinson—who had visited the PD's Office for purposes "of obtaining an attorney for outstanding charges" pending against him—if Robinson would speak to him about the incident, but "Robinson stated he ha[d] been told that he is not to talk to anyone about that. [Glatfelter] asked [Robinson] who told him that and when," but Robinson just stated that "[t]hey told me not to talk to anyone" and "would not explain who '[t]hey' were," so Glatfelter did not conduct an interview. (O.R., Item No. 81, Appendix to Petition, Ex. 2.) In the second memorandum, Glatfelter indicated that he spoke to Robinson on June 21, 2011, "on the street," explaining that he was not "trying to [j]am [Robinson] up in any way" and "only want[ed] to talk about the drinking and smoking," and that he gave Robinson his contact information "as [Robinson] did not seem real comfortable talking to [Glatfelter] on the street." (O.R., Item No. 81, Appendix to Petition, Ex. 3.)

The Commonwealth filed a response to Towles' second PCRA petition. The Commonwealth first claimed that the petition was untimely filed because Towles failed to demonstrate that he acted with due diligence in obtaining Robinson's affidavit to establish

both the "governmental interference" exception and the "newly discovered facts" exception. The Commonwealth also argued that Towles' *Brady* claim lacked merit. Preliminarily, the Commonwealth disputed that the Commonwealth had threatened Robinson and that the Commonwealth suppressed such evidence. In support, the Commonwealth attached to its response an affidavit from former First Assistant District Attorney Christopher P. Larsen (DA Larsen), who was tasked with aiding the investigation of the incident and prosecuting Towles. That affidavit provides, in relevant part:

1. I served as an Assistant District Attorney from 2000-2008 and as the First Assistant District Attorney from 2008-2019 for Lancaster County, Pennsylvania.

2. In my capacity as First Assistant District Attorney I was assigned to assist in the investigation into the shooting death of . . . Stewart, as well as prosecute the criminal homicide charge against . . . Towles for that murder.

3. I am familiar with the investigation, case preparation, evidence, and witnesses involved in the prosecution of . . . Towles . . . .

4. In the course of the investigation, a witness, . . . Robinson, came forward. . . . Robinson came forward through his mother, who reached out to a Lancaster Bureau of Police detective with whom . . . Robinson was familiar from a prior investigation in which . . . Robinson was the victim of an assault.

5. During the investigation and case preparation I had numerous occasions to interact with . . . Robinson. At all times during our interactions, . . . Robinson was a cooperative witness and at no time were any threats made by myself or, to my knowledge, any of the investigating officers or detectives in order to compel him to testify.

6. At no time did . . . Robinson articulate or display concern regarding any alleged threats from any member of law enforcement. The only concerns ever expressed by . . . Robinson were whether he could potentially be in trouble for his involvement and what repercussions he may face for being a witness for the prosecution. The response to both concerns was that . . . Robinson had to be truthful.

(O.R., Item No. 85, Exhibit A.) The Commonwealth also argued that Towles' *Brady* claim lacked merit because, even assuming that the Commonwealth had threatened Robinson to induce his trial testimony, such evidence was not material in the instant matter.

The PCRA court held an evidentiary hearing on November 16, 2021. Towles subpoenaed Robinson to appear at the hearing, but Robinson refused service of the subpoena and failed to appear. DA Larsen and Dennis Arnold (Detective Arnold), a detective with the Office of District Attorney of Lancaster County at the time of the incident, appeared and testified. At the beginning of the hearing, the parties addressed the issue of due diligence as it related to the timeliness of Towles' PCRA petition. Towles' PCRA counsel presented the PCRA court with several declarations, to which the parties stipulated, relating to the unsuccessful efforts of Towles' trial counsel, current PCRA counsel, and investigators to locate and/or speak with Robinson over the years, including attempts to contact Robinson at the time of trial and visits to certain home addresses post-conviction. (N.T., 11/16/2021, at 3-5, 8-11.) Towles' PCRA counsel also explained that he and co-counsel "saw Mr. Robinson walking down the street near his house" in January 2020, at which time PCRA counsel "asked if it was [Robinson], [Robinson] said yes," and then "[Robinson] told [them] the information." (*Id.* at 4-5.) PCRA counsel further explained that, "[a]bout two months later[,] when [PCRA counsel] were still attempting to see [Robinson] again, which was difficult[,] [PCRA counsel] saw [Robinson] again. [Robinson] signed a declaration . . . and within two months of that, [PCRA counsel] filed the instant petition." (*Id.* at 5.)

In response, the Commonwealth argued that "a cursory search of the [Administrative Office of Pennsylvania Courts Unified Judicial System Portal (UJS Portal)] show[ed] . . . Robinson was in Lancaster County Court no less than five times since 2015 . . . . [and that i]t would not have been difficult to locate him at one time at those proceedings had [PCRA counsel] done the search and looked it up." (*Id.*) The Commonwealth submitted a copy of Robinson's secure court summary, which the Commonwealth's attorney found "by simply typing [Robinson's] name in," and further

noted that "Robinson has been continually under supervision by [the] Lancaster County Adult Probation and Parole Office since 2015." (*Id.* at 5-6.) Towles' PCRA counsel represented his belief that they knew Robinson was on probation and/or parole but could not say whether they knew Robinson was in custody, indicated that if PCRA counsel had known Robinson was in custody PCRA counsel "likely would have attempted to see [Robinson] if he wasn't represented by counsel," and that it was fair to say that PCRA counsel was not present for any of Robinson's appearances in court throughout the years. (*Id.* at 11-12.)

PCRA counsel then called DA Larsen to testify, and he confirmed that he prosecuted Towles' case. (N.T., 11/16/2021, at 13.) Eventually, PCRA counsel questioned DA Larsen about the portion of DA Larsen's affidavit indicating that "the only concerns ever expressed by . . . Robinson were whether he could potentially be in trouble for his involvement." (*Id.* at 18.) DA Larsen could not recall if Robinson expressed this concern before trial, further explaining that he has spoken to Robinson "multiple times," had seen Robinson since trial, and would "bump into him on the street." (*Id.* at 18-19). Indeed, DA Larsen stated that he had a prior relationship with Robinson and has known Robinson "for quite some time" because Robinson was "a victim in an aggravated assault case a couple of years prior" to the shooting. (*Id.* at 19.) Notably, PCRA counsel then asked DA Larsen whether, at the time Robinson expressed his concern, DA Larsen "told [Robinson] as long as he told the truth he had nothing to worry about[.]" (*Id.*) DA Larsen responded, "Yes. I always say the same thing to any witness, that what they need to do is tell the truth." (*Id.*)

On cross-examination by the Commonwealth, DA Larsen confirmed that Robinson did not hesitate to come forward and speak to investigators or DA Larsen about the instant matter and explained that "[t]he way that . . . Robinson even became familiar to [the

prosecution] as being involved in this case was because of his mom reaching out to Detective Nickel of Lancaster City Bureau of Police[, who had worked with DA Larsen] on the case in which . . . Robinson was an assault victim." (*Id.* at 19-20.) DA Larsen also confirmed that neither he nor anyone at his direction told Robinson that he would be charged with a criminal offense if he did not testify or threaten him to get him to testify and that there were no "criminal offenses on the radar that . . . Robinson could have been charged with." (*Id.* at 20.) When asked by PCRA counsel on redirect about the crime of hindering apprehension of prosecution in light of Robinson's role in procuring a ride back to Lancaster following the shooting, DA Larsen replied, "If you're suggesting that in any way would apply to . . . Robinson, no." (*Id.* at 21.) On recross examination by the Commonwealth, DA Larsen confirmed that he would not "have authorized or filed the charge of hindering apprehension" and explained:

> So . . . Robinson[] lives in Lancaster. He wanted to get home. I can tell you this, quite frankly, the comments that he had were primarily concern about being targeted for his cooperation. So . . . if there was fear at all on . . . Robinson's part, it was because of pressure that he felt due to his connection with the defendant.

(*Id.* at 22.) The Commonwealth then called Detective Arnold, who confirmed that he assisted Lancaster County Detective Joseph Geesey (Detective Geesey) in an interview of Robinson after the shooting. (*Id.* at 23.) Detective Arnold also confirmed that neither he nor Detective Geesey threatened Robinson with criminal prosecution if he did not cooperate or otherwise made any threats towards Robinson during the interview.[7] (*Id.* at 23-24.)

---

[7] The PCRA court admitted all exhibits presented by the Commonwealth and Towles into evidence at the hearing.

After the hearing, Towles filed a motion to amend his second PCRA petition along with a proposed amended petition.[8]  The proposed amended petition "incorporate[d the] sworn statements from [DA] Larsen . . . and [DA] Larsen's testimony at the evidentiary hearing."  (O.R., Item No. 93, at 9.)  Towles contended that DA Larsen's affidavit and PCRA hearing testimony corroborated the interaction described in Robinson's affidavit insofar as DA Larsen acknowledged that Robinson expressed concerns about whether Robinson could be in trouble for his involvement and the repercussions he may face for testifying for the Commonwealth, and DA Larsen responded to both concerns by stating that Robinson had to be truthful.  Towles argued that DA "Larsen's response to . . . Robinson implied that . . . Robinson would receive leniency with regard to any possible prosecution for his involvement in the crime if he testified at trial, and, conversely, that he could be in trouble if he did[ not]" and that "[t]he prosecution had an affirmative duty to disclose this understanding."  (*Id.* at 17.)

Following post-hearing briefing, on May 5, 2022, the PCRA court issued an opinion and order dismissing Towles' petition.  In doing so, the PCRA court first concluded that Towles' petition was untimely filed.  After observing that Towles' petition was facially untimely, the PCRA court turned to Towles' assertion that the "governmental interference" exception and the "newly discovered facts" exception applied to his petition.  With respect to the "governmental interference" exception, Towles asserted that the Commonwealth interfered with his ability to bring his *Brady* claim by withholding evidence that Robinson "was both (a) threatened with criminal prosecution if he did not cooperate with the prosecution and testify at Towles' trial, and (b) implicitly offered a deal to 'receive favorable treatment if he cooperated and testified against . . . Towles.'"  (O.R., Item

---

[8] The PCRA court indicates that it granted Towles' motion to amend on April 1, 2022, though the record does not appear to contain the order.

No. 97, PCRA Ct. Op., 5/5/2022, at 10 (citation omitted) (quoting Towles' Post-Hearing Brief at 1).) As for his invocation of the "newly discovered facts" exception, Towles argued that his discovery of the Commonwealth's threats to and implied deals with Robinson constituted "newly discovered facts" for purposes of satisfying the exception. Towles added that, because he filed his second PCRA petition within one year of the date his counsel obtained Robinson's affidavit setting forth the alleged threats by the Commonwealth, Towles' second PCRA petition satisfied Section 9545(b)(2) of the PCRA.

Upon review, the PCRA court concluded that Towles did not satisfy either of the claimed timeliness exceptions under the PCRA because he failed to demonstrate that he exercised due diligence in obtaining the information upon which his claim was premised. (O.R., Item No. 97, PCRA Ct. Op., 5/5/2022, at 10-17 (quoting *Commonwealth v. Smith*, 194 A.3d 126, 133-34 (Pa. Super. 2018) (providing that, under both governmental interference exception and newly discovered facts exception, petitioner must show that he acted with due diligence in obtaining witness affidavit), *appeal denied*, 208 A.3d 64 (Pa. 2019)).) Beginning with Towles' efforts pre-trial and during trial to obtain the information supporting his *Brady* claim, the PCRA court observed that Towles was aware that Robinson, Towles' "'good friend' of ten years, voluntarily came forward the day after the homicide and gave multiple statements to the [d]etectives in the District Attorney's Office about [Towles'] involvement in the case." (*Id.* at 11-12 (citation omitted) (quoting N.T., 5/5/2012 to 5/7/2012, at 279-80).) The PCRA court further noted that Towles was aware that, prior to trial, Robinson was being held in Lancaster County Prison on unrelated charges. Indeed, Towles' trial counsel, Attorney Encarnacion, testified at the First PCRA hearing that he "went to see . . . Robinson at the [p]rison and was unsuccessful in getting a statement from [Robinson]." (*Id.* at 12.) The PCRA court also noted Glatfelter's interactions with Robinson prior to trial, wherein Robinson revealed

during the first encounter that "he had been told that he was not to talk to anyone about the homicide, although he declined to identify who had told him that;" and Robinson did not appear "'comfortable' talking to the investigator" on the street during the second encounter. (*Id.*) Moreover, the PCRA court observed that Towles' trial counsel also testified at the First PCRA Hearing that "Robinson originally lied in his statements to the police to minimize his involvement in the murder as he was 'probably . . . worried' about getting charged with crimes related to the homicide and particularly the gun." (*Id.* (quoting N.T., First PCRA Hearing, 9/18/2017, at 100).) The PCRA court reasoned that trial counsel knew "Robinson had initially acted to protect himself from criminal charges and might again." (*Id.*)

Based on the foregoing, the PCRA court observed that, for a year before Towles' trial at which Robinson testified for the Commonwealth, Towles knew that Robinson was: "(1) cooperating with the prosecution, (2) facing unrelated criminal charges, (3) fearful of acquiring new criminal charges related to the homicide, and (4) being told by someone not to cooperate with [Towles'] defense team." (*Id.* at 13.) Notwithstanding this knowledge of Robinson's "potentially impeachable testimony," the PCRA court observed that Towles' trial counsel did not ask Robinson during cross-examination at Towles' trial if the Commonwealth had made any threats or promises of reward in exchange for Robinson's testimony against Towles. (*Id.* at 13-14.) The PCRA court concluded that, under the particular circumstances of this case, "it would have been reasonable and prudent . . . for defense counsel to" take the opportunity presented during Robinson's trial testimony "to seek this information from . . . Robinson for impeachment purposes" by "question[ing] whether . . . Robinson was testifying for the Commonwealth pursuant to some promise or reward and/or threat." (*Id.* at 13 (relying upon *Commonwealth v. Davis*, 86 A.3d 883, 890-91 (Pa. Super. 2014), for proposition that due diligence does not require

defendant to make *unreasonable* assumption under specific facts of case (emphasis in original)).)  The PCRA court reasoned that Towles "cannot contend that a failure to question a Commonwealth witness at trial under oath about possible motive for his or her testimony is reasonable under these particular circumstances."[9]  (*Id.* at 13-14.)

Turning to Towles' post-trial efforts to learn the information serving as the basis for his *Brady* claim, the PCRA court first observed that "subsequent actions taken by past and present PCRA counsel to pursue . . . Robinson *post-trial* are less persuasive given . . . Robinson's availability *at trial* and [the] guaranty of truthfulness resulting from his oath *at trial*."  (*Id.* at 13 (emphasis in original).)  The PCRA court continued by noting that the record established that, upon review of trial counsel's file, Towles' first PCRA counsel, Attorney Himebaugh, "also would have been fully aware of . . . Robinson's refusal to cooperate with the defense, his fear of acquiring new criminal charges related to the homicide," and his silence resulting from someone telling him not to cooperate with the defense.  (*Id.* at 14.)  Attorney Himebaugh, however, failed to investigate Robinson further or interview him, though she raised an ineffectiveness challenge to trial counsel's failure to cross-examine Robinson on inconsistencies in his statements to police.  As for FCDO's involvement, the PCRA court observed that FCDO's representation of Towles began in 2015 in federal court and paralleled Attorney Himebaugh's representation of Towles in state court for several years.  The PCRA court acknowledged that two FCDO investigators, Kathleen Kaib (Kaib) and Kristyn Tempora (Tempora), indicated that they tried to locate and speak to Robinson "several times," travelling to his known and presumed addresses and his parents' home with no success.  (*Id.* at 14-15.)  The PCRA

---

[9] The PCRA court noted that Towles had not pursued a claim of ineffective assistance of counsel for failure to cross-examine Robinson on his motive for testifying and that, in any event, such a claim does not "save" an untimely PCRA petition.  *See Commonwealth v. Morris*, 822 A.2d 684, 694 (Pa. 2003) (providing that "a claim of ineffective assistance of counsel does not save an otherwise untimely petition for review on the merits").

court, however, explained that the investigators' declarations were "unclear" or "equivocal" as to the nature and extent of these efforts, such as whether the investigators took more than one trip to Lancaster and whether the investigators travelled there together or on separate occasions. (*Id.* at 15 nn.8-9.) The PCRA court added that, while current PCRA counsel—specifically Michael Gonzales, Esquire, and Alex Kursman, Esquire—also attempted "several times" to contact Robinson, "there was no reference as to when these attempts were made." (*Id.* at 15.)

Noting that PCRA counsel ultimately succeeded in interviewing Robinson on January 13, 2020, the PCRA court observed that the Commonwealth had introduced evidence to rebut Towles' claim of due diligence in trying to locate Robinson between 2015 and 2020:

> [T]he Commonwealth introduced evidence that had PCRA counsel or their investigators conducted a cursory search of the [UJS Portal] they would have discovered that, during the five years they were attempting to locate . . . Robinson, he had no less than five scheduled court appearances in the Lancaster County Court of Common Pleas. No attempts were made to locate . . . Robinson at these court proceedings, or to speak to his counsel of record to request an interview. Moreover, . . . Robinson has been continually under the supervision of the Lancaster County Office of Adult Probation and Parole Services since 2015, a fact of which PCRA counsel was aware, and yet no effort was made by the defense team to contact [Robinson's] probation officer.
>
> Rather, it would appear that by pure happenstance PCRA counsel saw . . . Robinson walking down the street near his home in 2020 and at that time he voluntarily divulged, ten years after the homicide, that Commonwealth "investigators threatened [him] that if [he] did not cooperate with them and testify at . . . Towles'[] trial, [he] could be charged with crimes related to the incident and could go to jail." Two months later, on March 5, 2020, counsel saw . . . Robinson again and had him sign a handwritten affidavit alleging that he was threatened into testifying for the Commonwealth. The mere fact that PCRA counsel could find . . . Robinson twice in two months outside of his home in 2020 defeats [Towles'] argument that he exercised due diligence over the preceding five-year period in trying to locate . . . Robinson.

(*Id.* at 15-16 (citations omitted) (footnotes omitted).)[10] The PCRA court continued:

> When customary efforts at locating the material witness in this case were unsuccessful ([*i.e.*, ]knocking on the door of the witness's home and the home of his parents), it would not have been unreasonable or extraordinary for investigators or counsel to review the court summaries and criminal records of a known repeat offender, or to contact his probation officer or defense attorney to initiate contact. Failing to use known, reliable sources to locate a material witness is not reasonable. The fact that . . . Robinson may have been testifying for the Commonwealth against his good friend because of threats or promises or deals must have been obvious to [Towles] at the time of trial in 2012. Therefore, [Towles] bore the duty to seek out the facts that he now attempts to use to support his *Brady* claim ten years later.

(*Id.* at 17 (footnote omitted).)[11] Concluding that Towles failed to demonstrate that he had acted with due diligence in obtaining the information relating to the Commonwealth's alleged threats to or agreement with Robinson, the PCRA court held that Towles failed to meet either timeliness exception at issue and that Towles' serial PCRA petition must be dismissed as untimely filed.

Alternatively, the PCRA court concluded that Towles' *Brady* claim was without merit. The PCRA court first concluded that Towles failed to establish that the Commonwealth made threats or promises to Robinson to secure his trial testimony against Towles. In support, the PCRA court noted that, while Towles presented

---

[10] The PCRA court noted that, "[a]lthough . . . Robinson's alleged signature appear[ed] at the bottom of the affidavit, the document appear[ed] to have been drafted by PCRA counsel and not at the affiant's dictation" and that Robinson's failure to appear at the PCRA hearing precluded the Commonwealth from cross-examining Robinson to determine the veracity of the averments contained therein. (O.R., Item No. 97, PCRA Ct. Op., 5/5/2022, at 16 n.10.) The PCRA court further commented that it was "unclear why counsel did not take a signed statement from . . . Robinson in January 2020 when he first revealed the alleged threats by the Commonwealth." (*Id.* at 16 n.11.)

[11] The PCRA court observed that, at Towles' trial, the parties stipulated that "Robinson had a prior criminal record consisting of two misdemeanors of the third degree for theft by unlawful taking and was on parole at the time of trial for a probation violation related to possession of marijuana." (O.R., Item No. 97, PCRA Ct. Op., 5/5/2022, at 17 n.12.) Moreover, "Robinson's criminal activity continued through 2020." (*Id.*)

Robinson's affidavit at the hearing on Towles' second PCRA petition, Towles failed to present Robinson at the hearing for cross-examination, thereby preventing the PCRA court from determining Robinson's credibility as the affiant. The PCRA court added that "the affidavit was directly contradicted by the credible testimony of" DA Larsen and Detective Arnold. (*Id.* at 19.) The PCRA court observed that DA Larsen "testified unequivocally that he did not make threats against or promises to . . . Robinson in exchange for his testimony" and that, to the contrary, DA "Larsen testified that . . . Robinson was, in fact, fearful of [Towles] and of retaliation for cooperating with the prosecution." (*Id.*) The PCRA court explained that DA Larsen's testimony was consistent with DA Larsen's affidavit providing that "Robinson had concerns about the repercussions he may face for being a witness for the prosecution," which, again, related to a threat from Towles. (*Id.* at 19-20 (internal quotations omitted).) The PCRA court further noted that Detective Arnold testified consistently with DA Larsen that neither Detective Arnold nor Detective "Geesey ever threatened . . . Robinson with criminal prosecution if he did not cooperate with the prosecution, nor did they make any threats of any other kind." (*Id.* at 20.)

Moreover, the PCRA court reasoned that, while DA Larsen stated in his affidavit that he told Robinson to "be truthful" in response to Robinson's expression of concern about "whether he could potentially be in trouble for his involvement [in the homicide] and what repercussions he may face for being a witness for the prosecution," the PCRA court emphasized that "[t]he concern voiced by . . . Robinson was not about testifying *for* the Commonwealth, but rather about the repercussions of testifying *against* [Towles]." (*Id.* (emphasis in original).) The PCRA court explained that it appeared that Robinson was not afraid of being charged for his involvement in the crime or with perjury if he did not testify truthfully for the Commonwealth, but that Robinson instead feared Towles. In

further support of this conclusion, the PCRA court opined, *inter alia*, that Towles had repeatedly warned Robinson immediately after the homicide not to speak to anyone about the shooting. (*Id.*) The PCRA court added that, in Robinson's third and final statement to police, Robinson said "that he had not been completely honest with the interviewing officers previously because he was 'afraid' that 'the person who committed the crime [*i.e.*, Towles] and other people on the "street" would harm him to keep him from telling all the facts to the police.'" (*Id.*) The PCRA court explained that DA Larsen's hearing testimony "confirmed that . . . Robinson was always a 'cooperating' witness.'" (*Id.* at 21.) The PCRA court added that "it was . . . Robinson who initially contacted the police about his involvement in and knowledge of the homicide, although he initially tried to minimize his part in the incident," and he "continued to reach out to the police on subsequent occasions to give additional information or to correct previous misinformation." (*Id.* (footnotes omitted).) The PCRA Court also noted DA Larsen's testimony that the prosecution had no intention to charge Robinson in relation to the crime, nor were there any criminal offenses with which to charge him, and that DA Larsen's "admonition to . . . Robinson 'to be truthful' in his statements to the police and in his trial testimony was consistent with his advice to all Commonwealth witnesses." (*Id.*)[12] Accordingly, the PCRA court reasoned that, rather than proving any alleged threats or promises between the Commonwealth and Robinson, the evidence established that Robinson was a

---

[12] In a series of footnotes, the PCRA court also observed that: (1) Robinson "obviously felt comfortable talking to the police and to [DA] Larsen" given their prior relationship; (2) at the end of each of the three statements Robinson gave to the police in 2010, "Robinson attested to the fact that the statements were made 'of [his] own free will without any fear, threats or promises of leniency or reward from [the police] or anyone else;'" and (3) while Towles' PCRA counsel suggested that the Commonwealth could have charged Robinson with hindering apprehension in relation to the incident, DA "Larsen testified unequivocally that he would not have authorized the filing of such a charge against . . . Robinson under the circumstances of this case." (O.R., Item No. 97, PCRA Ct. Op., 5/5/2022, at 21 nn.13-15.)

cooperating witness for the Commonwealth and never indicated any reluctance to testify against Towles at trial, though Robinson feared possible retaliation from Towles and Towles' friends for his cooperation.[13] (*Id.* at 21-22.)

## II. ISSUES

Towles appealed the PCRA court's order to this Court, raising the following two issues:

1. Is . . . Towles's *Brady* claim, which was filed within months after learning of undisclosed threats and promises by the trial prosecutor to the Commonwealth's key witness, timely under 42 Pa. C.S. § 9545(b)(i) & (ii)?

2. Did the Commonwealth violate *Brady* . . . by failing to disclose material, favorable evidence concerning threats made to a witness if he did not cooperate and implied promises of leniency if he did?

(Towles' Brief at 1.)

## III. STANDARD OF REVIEW

With respect to the principles governing our review of a PCRA court's order, this Court has explained:

[W]e must determine whether the findings of the PCRA court are supported by the record and whether the court's legal conclusions are free from error. The findings of the PCRA court and the evidence of record are viewed in a light most favorable to the prevailing party. The PCRA court's credibility determinations, when supported by the record, are binding; however, this [C]ourt applies a *de novo* standard of review to the PCRA court's legal conclusions. We must keep in mind that the petitioner has the burden of persuading this Court that the PCRA court erred and that such error requires relief. Finally, this Court may affirm a valid judgment or order for any reason appearing of record.

*Commonwealth v. Montalvo*, 205 A.3d 274, 286 (Pa. 2019) (citations omitted).

---

[13] The PCRA court also concluded that, even if Towles had established the existence of undisclosed threats or promises by the Commonwealth to Robinson, such evidence was not material to the case.

## IV. TIMELINESS OF TOWLES' PCRA PETITION

### A. PARTIES' ARGUMENTS

Towles argues that his *Brady* claim is not time-barred under the "governmental interference" exception and "newly discovered facts" exception and that, in reaching its contrary conclusion, the PCRA court incorrectly applied the "due diligence" standard under the facts of this case. Preliminarily, Towles submits that his *Brady* claim falls within the "governmental interference" exception because his failure to raise the claim earlier resulted from the Commonwealth's suppression of information regarding the understanding between Robinson and the prosecution despite its legal obligation to disclose such information under *Brady*. Towles also argues that his *Brady* claim meets the "newly discovered facts" exception because the claim is predicated on facts that he did not know until January 2020, when he learned about the threats and/or implied promises made by the Commonwealth to Robinson. Towles adds that he could not have ascertained those facts previously upon the exercise of due diligence, arguing that he is entitled to presume that the Commonwealth discharged its duties under *Brady* and that his counsel "diligently sought to discover any undisclosed, exculpatory evidence." (Towles' Brief at 20.) Finally, Towles submits that, by filing his claim on May 4, 2020, he filed his petition within one year of the date his claim could have been presented under Section 9545(b)(2) of the PCRA.

Turning to the PCRA court's disposition, Towles asserts that the PCRA court improperly concluded that Towles was not duly diligent in discovering his claim for purposes of establishing both timeliness exceptions.[14] In doing so, Towles submits that

---

[14] The PCRA court's approach—wherein it required Towles to demonstrate due diligence relative to both the "governmental interference" exception and the "newly discovered facts" exception—is aligned with existing precedent from this Court. *See, e.g.*, *Commonwealth v. Stokes*, 959 A.2d 306, 310 (Pa. 2008) (explaining that Section 9545(b)(2) of PCRA "requires a petitioner to plead and prove that the information (continued…)

the PCRA court focused on additional steps that defense counsel could have taken—which, Towles argues, there virtually always are—while rejecting the reasonable steps counsel did take in discovering Towles' claim. With respect to the PCRA court's observations relating to trial counsel's lack of due diligence for failing to cross-examine Robinson on the issue at trial, Towles argues that "[t]he PCRA court's logic turns *Brady* on its head," that "[t]rial is not the time for discovery," and that, if accepted, the PCRA court's "rule" would allow the Commonwealth to "suppress all deals with its witnesses and require the defense to ask witnesses whether they received deals without knowing the answer." (Towles' Brief at 16-17.) Towles further argues that the Court of Appeals for the Eighth Circuit rejected a nearly identical argument to the logic employed by the PCRA court here in *Jimerson v. Payne*, 957 F.3d 916 (8th Cir. 2020). As for the failure of Towles' PCRA counsel to contact Robinson's probation officer or counsel of record post-trial, Towles contends that "there is no reason to believe that . . . Robinson would have been more willing to talk under those circumstances than if he were at home" in light of Robinson's reluctance to talk to Towles' counsel in the past and that it was reasonable

---

on which he relies could not have been obtained earlier, despite the exercise of due diligence" and that, "[t]hus, with respect to both [the governmental-interference and newly -discovered-facts] exceptions, [a petitioner] is required to show that he could not have filed his claim earlier"); *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa.) (imposing due diligence requirement as to "governmental interference" and "newly discovered facts" exceptions in context of asserted *Brady* violation), *cert. denied*, 555 U.S. 916 (2008); *see also Commonwealth v. Breakiron*, 781 A.2d 94, 98 (Pa. 2001) (concluding that appellant failed to meet governmental interference exception premised upon *Brady* violation for Commonwealth's failure to disclose, *inter alia*, that witness "had a non-final criminal conviction at the time of trial, giving him a substantial incentive to 'curry favor' with the Commonwealth" because, while appellant argued that failure to raise claims previously was result of "Commonwealth's violation of its continuing obligation to disclose *Brady* material," appellant "failed to set forth any evidence as to when and how he discovered the *Brady* material [and] offer a reasonable explanation as to why this information, with the exercise of due diligence, could not have been obtained earlier"). Towles does not argue that the PCRA court erred in utilizing this approach or otherwise advocate for a change in the law.

"to attempt to contact . . . Robinson directly when he was not represented by counsel, rather than through . . . Robinson's counsel, who might not have allowed an interview." (*Id.* at 18.)

Towles contends that his counsels' actions were reasonable under the circumstances, highlighting that trial counsel repeatedly attempted to talk to Robinson but was rebuffed, the prosecution had represented pretrial that no threats or promises were made to Robinson, and current counsel had no reason to believe the Commonwealth had violated *Brady* or that Robinson would speak to counsel but nonetheless made multiple attempts to interview him. Towles argues that due diligence does not require him "to assume that the prosecution was untruthful" or "to continue badgering . . . Robinson after his repeated refusals to speak with those working on . . . Towles'[] behalf." (*Id.* at 18-19.) Towles adds that he "did not 'fail[] to use known, reliable sources to locate a material witness,'" as "he eventually found . . . Robinson in 2020 at his home where [Towles] had made numerous attempts to find him over the years." (*Id.* at 19.) Towles faults the PCRA court for imposing a higher burden of diligence upon Towles than required by law based on its observations that Towles was aware or must have been aware of Robinson's potentially impeachable testimony at the time of trial, noting that courts have rejected similar logic when considering the due diligence standard in the federal context. (*Id.* (citing *Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013), *cert. denied*, 573 U.S. 918 (2014)).)

The Commonwealth counters that the PCRA court properly found that Towles' second PCRA petition was untimely filed due to Towles' failure to exercise due diligence in asserting his claim. In support, the Commonwealth highlights the PCRA court's rationale that, despite having information prior to trial relative to Robinson's initial untruthfulness, concern about being charged for his involvement in the crime, and

reluctance to talk to anyone about the crime based upon someone's directive, Towles' trial counsel "never took the reasonable step of challenging . . . Robinson under oath as to his motives for testifying or the identity of the person that told him not to talk." (Commonwealth's Brief at 14-15.)  The Commonwealth also emphasizes that, "[d]espite all the fruitless efforts to reach [Robinson] at his home" following Towles' conviction, Towles' counsel and investigators "appear to never have taken the reasonable step[s] of checking court dockets for a witness with a known criminal record," "reaching out to . . . Robinson's counsel of record in any of those cases to arrange a meeting," or attempting to contact "Robinson's probation officer despite knowing that he has continually been under" supervision since 2015.  (Id. at 16.)  The Commonwealth submits that the record establishes that Towles could have interviewed Robinson on multiple occasions had he taken reasonable steps to locate Robinson and that, as such, he cannot avail himself of the claimed timeliness exceptions.[15]

## B.  DISCUSSION

This matter squarely implicates Section 9545 of the PCRA, pertaining to jurisdiction and proceedings, and, more particularly, subsection (b) thereof, pertaining to time for filing a petition.[16]  It is well settled that "[t]he PCRA's timeliness requirements are

---

[15] In reply, Towles reiterates that the Commonwealth, like the PCRA court, seeks to impose a higher standard than the due diligence required under the law by focusing on whether there were additional steps that defense counsel could have taken to discover the claim at issue rather than analyzing whether the steps counsel did take were reasonable.

[16] Section 9545(b) of the PCRA provides, in part:

> (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the

(continued…)

jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed." *Abu-Jamal*, 941 A.2d at 1267-68. As noted, all PCRA petitions generally must be filed within one year of the date that a petitioner's judgment of sentence becomes final to be deemed timely filed. 42 Pa. C.S. § 9545(b)(1); *Marshall*, 947 A.2d at 719. The PCRA, however, further provides three exceptions to the one-year jurisdictional time-bar, the applicability of which a petitioner must plead and prove. *See* 42 Pa. C.S. § 9545(b)(1)(i)-(iii); *Abu-Jamal*, 941 A.2d at 1268 (providing that PCRA petitioner has "burden to allege and prove that one of the timeliness exceptions applies"). Relevant here, the "governmental interference" exception—set forth in Section 9545(b)(1)(i) of the PCRA—requires a petitioner to establish that "the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States," and the "newly discovered facts" exception—set forth in Section 9545(b)(1)(ii) of the PCRA—requires a petitioner to show that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa. C.S. § 9545(b)(1)(i)-(ii). Additionally, the PCRA requires that "[a]ny petition invoking an

---

Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within one year of the date the claim could have been presented.

exception . . . shall be filed within one year of the date the claim could have been presented." 42 Pa. C.S. § 9545(b)(2).

As mentioned previously, it is undisputed that Towles' second PCRA petition is facially untimely given that he filed it approximately five years after his judgment of sentence became final in March 2015. We turn, then, to a determination of whether Towles satisfied the requirements of the "governmental interference" and "newly discovered facts" exceptions and, upon review, conclude that he failed to do so. We begin by noting that the PCRA court afforded Towles an evidentiary hearing on his serial PCRA petition to prove that he timely filed the petition under both of the asserted timeliness exceptions and that his underlying *Brady* claim had merit. At that hearing, the PCRA court accepted into evidence, *inter alia*, the affidavits of Robinson and DA Larsen, and it heard the testimony of DA Larsen and Detective Arnold. Critically, while Robinson attested in his affidavit that the Commonwealth induced him to testify against Towles pursuant to a threat of prosecution, Robinson failed to appear and testify at the PCRA hearing, thereby precluding the Commonwealth from cross-examining him on his attestations and the PCRA court from assessing his credibility. Furthermore, the affidavit and hearing testimony provided by DA Larsen, along with the testimony provided by Detective Arnold, directly contradicted Robinson's attestations and indicated that the Commonwealth did not induce Robinson's testimony against Towles at trial.

Ultimately, the PCRA court found that DA Larsen and Detective Arnold were credible and that the Commonwealth did not induce Robinson's testimony by threat, promise, agreement, or otherwise. Moreover, the PCRA court did not look favorably upon Robinson's affidavit itself in analyzing Towles' petition. (See O.R., Item No. 97, PCRA Ct. Op., 5/5/2022, at 16 n.10 (describing affidavit as "alleged[ly]" signed by Robinson and "appear[ing] to have been drafted by PCRA counsel" and "not at [Robinson's] dictation"

and noting inability "to determine the veracity of the averments contained in the affidavit"); *see also id.* at 19 ("At the 2021 PCRA hearing, Towles presented Robinson's affidavit in support of his claim, but did not present [Robinson] for cross-examination, and the Court could not, therefore, determine [Robinson's] credibility. In fact, the affidavit was directly contradicted by the credible testimony of the two witnesses presented at the PCRA hearing." (internal citations omitted)).) In other words, no credible evidence of record establishes that Robinson, in fact, claimed that the Commonwealth induced his testimony, let alone that this inducement actually happened. While the parties dispute whether the PCRA court erred in concluding that the Commonwealth did not induce Robinson's trial testimony against Towles, at bottom, the PCRA court's credibility determinations and findings on this point are supported by the record, which we view in favor of the Commonwealth, as previously described. *See Montalvo*, 205 A.3d at 286 (providing that we review PCRA court's findings and credibility determinations to determine whether they are supported by record, which is viewed in light most favorable to prevailing party); *see also Commonwealth v. Brown*, 196 A.3d 130, 178 (Pa. 2018) (explaining that "PCRA court granted an evidentiary hearing to receive and consider [affiant's] testimony, but [affiant] failed to appear" and that, "[a]bsent testimony from [affiant] to support the contentions in his affidavit, the PCRA court properly concluded that [PCRA petitioner's] claim lacked arguable merit and was not prejudicial"); *Commonwealth v. Tharp*, 101 A.3d 736, 750 (Pa. 2014) (concluding that record supported "PCRA court's factual finding that no undisclosed agreement existed[ that] was suppressed by the Commonwealth" despite "that other evidence presented at the PCRA evidentiary hearing suggested that an oral agreement may have been reached").

Simply stated, in the absence of any proof as to Robinson's claim that the Commonwealth induced his testimony, Towles did not demonstrate that his failure to raise

his claim previously was the result of the Commonwealth's unlawful interference—*i.e.*, the Commonwealth's ongoing failure to disclose that Robinson's testimony was procured pursuant to an existing threat or promise by the Commonwealth in violation of *Brady*. Towles likewise failed to establish the operative newly discovered factual predicate upon which his claim is premised—that factual predicate being that Robinson claimed that he provided his testimony against Towles based on a threat by or understanding with the Commonwealth.[17] For these reasons alone, Towles did not meet his burden to prove the

---

[17] Justice Wecht would allow a mere allegation in a discredited affidavit to be sufficient to overcome the timeliness bar. It is axiomatic, however, that a PCRA petitioner not only plead but also prove the requirements of a PCRA timeliness exception. *See* 42 Pa. C.S. § 9545(b)(1) (requiring that PCRA "petition allege[] and the petitioner prove[]" timeliness exceptions).

In support of his position, Justice Wecht cites to this Court's Opinion in Support of Reversal (OISR) in *Commonwealth v. Robinson*, 204 A.3d 326 (Pa. 2018), in support of the notion that we improperly mix the merits into our timeliness analysis in the context of the "newly discovered facts" exception. *Robinson*, however, presents a factual scenario different than that now before the Court. In *Robinson*, the petitioner, through newspaper articles, became aware of newly discovered "facts"—*i.e.*, emails involving a former Justice of this Court. Those emails, according to the petitioner, established bias on the part of the former Justice, thereby denying him of a fair review of his initial PCRA petition. *Robinson*, 204 A.3d at 330-31. There was no dispute as to the existence of the emails in question; rather, this Court debated whether the emails—which post-dated the former Justice's participation in the petitioner's first PCRA petition and did not mention the petitioner or his case—were sufficiently related to the petitioner such that they could be relied upon to establish a timeliness exception as newly discovered facts. This Court, in attempting to resolve that issue, divided. The OISR concluded that the "argument implicates the merits of the claim raised, not the timeliness of the petition," whereas the Opinion in Support of Affirmance (OISA) required some particularized nexus between the emails and the petitioner's case. *Id.* at 342. Justice Dougherty, as author of the OISA, wrote:

> Whether there is a connection between the newly[ ]discovered facts regarding [the former Justice's] emails to appellant's underlying claim sufficient to overcome the time bar is not self-evident in this case—as it was in [*Commonwealth v. Chmiel*, 173 A.3d 617 (Pa. 2017),] (where the published press release contained an admission by the FBI that its microscopic hair analysis was flawed in the great majority of cases in which hair analysis evidence was presented).

(continued…)

applicability of the "governmental interference" exception and the "newly discovered facts" exception to the PCRA's one-year jurisdictional time-bar. As such, his second PCRA petition is untimely filed. Accordingly, although our reasoning differs from that of the PCRA court, we affirm the PCRA court's order dismissing Towles' second PCRA petition.[18] *See Commonwealth v. Montalvo*, 205 A.3d at 286 (providing that "this Court may affirm a valid judgment or order for any reason appearing of record").

## V. CONCLUSION

Based on the foregoing, we conclude that Towles' second PCRA petition is untimely filed. We, therefore, affirm the order of the PCRA court dismissing the petition.

Chief Justice Todd and Justices Dougherty and Mundy join the opinion.

Justice Donohue files a concurring opinion.

Justice Wecht files a concurring opinion.

---

*Id.* at 354. Importantly, in the three cases relied upon by Justice Wecht to challenge our reliance on Towles' failure to establish a claim of inducement—*Robinson*, *Chmiel*, and *Commonwealth v. Blakeney*, 193 A.3d 350 (Pa. 2018)—the existence of the predicate fact was not in question—just the nexus of that fact to the "merits." Here, the predicate fact (*i.e.*, the claim of inducement) itself is in question and, if it exists, is but *one of three factors* that must be proven to establish the merit of a *Brady* violation claim. *See Bagnall*, 235 A.3d at 1086 (setting forth requirements to prove *Brady* violation).

[18] In rendering our decision, we acknowledge that questions may endure about the appropriateness of a due diligence inquiry when analyzing timeliness under Section 9545(b)(1)(i) of the PCRA. *See supra* note 14. As such questions are not necessary to our disposition and the parties do not provide developed advocacy on the subject, answers to those questions must wait for another day and another case.